**REDACTED**

RECORD NO. 14-1654

# IN THE
# 𝖀𝖓𝖎𝖙𝖊𝖉 𝕾𝖙𝖆𝖙𝖊𝖘 𝕮𝖔𝖚𝖗𝖙 𝖔𝖋 𝕬𝖕𝖕𝖊𝖆𝖑𝖘
## FOR THE FOURTH CIRCUIT

HANWHA AZDEL, INC., F/K/A AZDEL, INC.,

*Plaintiff - Appellant,*

v.

C&D ZODIAC, INC.,

*Defendant - Appellee,*

and

NEENAH TECHNICAL MATERIALS, INC.,

*Movant - Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
AT LYNCHBURG

**OPENING BRIEF OF APPELLANT
HANWHA AZDEL, INC., F/K/A AZDEL, INC.**

Francis H. Casola (VSB # 29108)
Frank K. Friedman (VSB # 25079)
Erin B. Ashwell (VSB # 79538)
WOODS ROGERS, PLC
10 South Jefferson Street, Suite 1400
Roanoke, Virginia 24011
(540) 983-7600 Telephone
(540) 983-7711 Facsimile

*Counsel for Appellant*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of all parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No. __14-654__          Caption: __Hanwha Azdel, Inc. f/k/a Azdel, Inc. v. C&D Zodiac, Inc.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Hanwha Azdel, Inc.__
(name of party/amicus)

_____

who is _____appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO


2.    Does party/amicus have any parent corporations?                        ☑ YES ☐ NO
      If yes, identify all parent corporations, including grandparent and great-grandparent corporations:
      Hanwha Corporation, Hanwha E&C Corporation, Hanwha Chemical Corporation, Hanwha L&C Corporation, Hanwha L&C Holdings USA, Inc., Hanwha Holdings (USA), Inc., Hanwha Machinery, Inc., Hanwha America Development, Inc., Hanwha International Corporation, Hanwha L&C Holdings USA LLC

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                                 ☐ YES ☑ NO
      If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct
      financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐YES ☑NO
      If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
      If yes, identify any publicly held member whose stock or equity value could be affected
      substantially by the outcome of the proceeding or whose claims the trade association is
      pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
      If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/ Erin B. Ashwell _____    Date: _____7/11/2014_____

Counsel for: Hanwha Azdel, Inc. _____

# CERTIFICATE OF SERVICE
****************************

I certify that on _____7/11/2014_____ the foregoing document was served on all parties or their
counsel of record through the CM/ECF system if they are registered users or, if they are not, by
serving a true and correct copy at the addresses listed below:

Robert Paul Silverberg                    James E. Evans
Silverberg, Goldman & Bikoff, LLP         Choate, Hall & Stewart, LLP
1101 30th Street, N.W., Suite 120         Two International Place
Washington, DC 20007                      Boston, MA 02110

William Earl Phillips  & Allison Gobble
Edmunds & Williams
 P.O. Box 958
 Lynchburg, VA 24505

/s/ Erin B. Ashwell _____         _____7/11/2014_____
      (signature)                                   (date)

- 2 -

TABLE OF CONTENTS

CORPORATE DISCLOSURE

TABLE OF AUTHORITIES ...................................................................iv

JURISDICTIONAL STATEMENT ..........................................................1

STATEMENT OF ISSUES PRESENTED FOR REVIEW .......................1

STATEMENT OF THE CASE ..................................................................3

STATEMENT OF FACTS ........................................................................9

STANDARD OF REVIEW .....................................................................28

SUMMARY OF ARGUMENT ...............................................................29

ARGUMENT ..........................................................................................32

    I.    The District Court Erred in Finding that Zodiac Did Not
           Disclose Azdel's Confidential Information, Where the
           Evidence In Best Light to Azdel Established Multiple
           Breaches of the Parties' Agreements ...................................32

           A.    The District Court Erred In Ruling that Zodiac Did
                    Not Breach the NDA in the Face of Direct
                    Evidence That Zodiac Wrongfully Disclosed
                    Azdel's Pricing ..........................................................32

           B.    Zodiac Violated the NDA When It Provided Crane
                    with Azdel's Developmental 1350GSM Weight
                    Aero-Lite ...................................................................36

           C.    The Specification Disclosed by Zodiac Was
                    Confidential ...............................................................39

    II.    The District Court Erred in Ruling that Zodiac's
           Wrongful Disclosure Did Not Injure Azdel Where
           California Law Recognizes Such Harm ...............................41

A.  Zodiac Injured Azdel When It Aided Crane With Azdel's Confidential Information ...............................................42

B.  The District Court Erred in Resolving Fact Questions About Damages that Were Contested and Irrelevant And Where Azdel Had Been Denied Discovery on Damages ............................................................45

III.  Pursuant to Va. Code § 8.2-606(1) Zodiac Must Pay for the 144 Sheets of Aero-Lite it Accepted ...........................................46

A.  Under Virginia's Adoption of the UCC, Zodiac Accepted Azdel's Goods ........................................................46

B.  The District Court Erred By Allowing A Purchase Order to Change the Terms of the Master Agreement .............................................................................47

C.  In the Alternative a Jury Should Have Weighed Whether Zodiac Seasonably and Properly Rejected Azdel's Shipment ....................................................................49

IV.  The District Court Erred By Reading the Master Agreement's Provisions In Conflict With One Another – And By Taking Facts In Best Light To Zodiac – To Conclude Zodiac Could Cancel Its Purchase Order for 2,900 Sheets of Aero-Lite ...............................................................50

A.  The Specification Was the Only Standard For 2000GSM Aero-Lite ....................................................................51

B.  The District Court Erred in Resolving Factual Disputes and Making Credibility Determinations to Rule Azdel's Product Deficient ............................................53

C.  American Airlines Did Not Request a Return to Conventional Material .............................................................55

D.    The District Court Erred in Permitting Zodiac to Terminate a Purchase Order Because the Master Agreement Only Permitted Zodiac to Cancel Purchase Orders if it Canceled the Master Agreement ...................................................................56

V.    The District Court Erred in Ruling That Zodiac Did Not Have to Pay for the Partial Shipment of 1320GSM Aero-Lite It Formed, Used and Did Not Reject ...........................................58

VI.    The District Court Erred in Permitting Crane to Withhold Documents Under a Common Interest Privilege ................................59

CONCLUSION ...................................................................................62

REQUEST FOR ORAL ARGUMENT ..................................................62

CERTIFICATE OF COMPLIANCE....................................................63

CERTIFICATE OF SERVICE ............................................................64

# TABLE OF AUTHORITIES

## Cases

*Ajaxo Inc. v. E*Trade Group, Inc.*,
  135 Cal.App.4th 21 (6th Dist. 2005) ............................................................*passim*

*American Furniture Co., Inc. v. Sheraton Corp.*,
  854 F.2d 1316 (4th Cir. 1998) (unpublished) ......................................................59

*Ames v. American Nat. Bank of Portsmouth*,
  163 Va. 1, 176 S.E. 204 (Va. 1934).....................................................................52

*Amos v. Coffey*,
  228 Va. 88, 320 S.E.2d 335 (Va. 1984)..........................................................48, 52

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)..........................................................................................*passim*

*Baltimore Scrap Corp. v. David J. Joseph Co.*,
  1996 WL 720785 (D. Md. 1996) ...................................................................60, 61

*Countryside Orthopaedics, P.C. v. Peyton*,
  261 Va. 142, 541 S.E.2d 279 (Va. 2001)...............................................................40

*Dulaney v. Packaging Corp. of America*,
  673 F.3d 323 (4th Cir. 2012) ...............................................................................28

*Eden Hannon & Co. v. Sumitomo Trust & Banking Co.*,
  914 F.2d 556 (4th Cir. 1990) ..........................................................................*passim*

*Flowers Baking Co. of Lynchburg, Inc. v. R-P Packing, Inc.*,
  229 Va. 370, 329 S.E.2d 462 (Va. 1985)...............................................................49

*Forrest Creek Assoc., Ltd. v. McLean Sav. & Loan Ass'n*,
  831 F.2d 1238 (4th Cir. 1987) ......................................................................47, 52

*Foster Poultry Farms, Inc. v. Suntrust Bank*,
  377 Fed. App'x 665 (9th Cir. 2010) .................................................30, 41, 42, 43

*In re Grand Jury Subpoena: Under Seal*,
  415 F.3d 333 (4th Cir. 2005) ........................................................................60, 61

iv

*Green Hill v. Greenko Corp.*,
   891 F.2d 286 (4th Cir. 1989) ..............................................................46

*Hardwick ex rel. Hardwick v. Heyward*,
   711 F.3d 426 (4th Cir. 2013) ...............................................28, 37, 54

*Moore & Moore General Contractors, Inc. v. Basepoint, Inc.*,
   253 Va. 304, 485 S.E.2d 131 (Va. 1997)......................................46, 59

*Plunkett v. Plunkett*,
   271 Va. 162, 624 S.E.2d 39 (Va. 2006)............................................52

*Pysell v. Kleck*,
   263 Va. 457, 559 S.E.2d 667 (Va. 2002).....................................51, 52

*Rosetta Stone Ltd. v. Google*,
   676 F.3d 144 (4th Cir. 2012) ..............................................................28

*Sl Montevideo Tech., Inc. v. Easton Aerospace LL*,
   491 F.3d 350 (8th Cir. 2007) ..............................................................32

*Snepp v. United States*,
   444 U.S. 507 (1980)......................................................................32, 42

*United States v. Aramony*,
   88 F.3d 1369 (4th Cir. 1996) .......................................................60, 61

*United States v. Okun*,
   281 Fed.App'x 228 (4th Cir. 2008) ..............................................60, 61

*United States v. Schwimmer*,
   892 F.2d 237 (2nd Cir. 1989) .............................................................60

*Uzyel v. Kadisha*,
   188 Cal.App.4th 866 (2nd Dist. 2010) ...............................................42

*Wuchenich v. Shenandoah Memorial Hosp.*,
   215 F.3d 1324 (4th Cir. 2000) ...........................................................52

**Statutes**

Ca. Civ. Code § 3521 ................................................................32

Cal. Civ. Code § 3523 ..........................................................32, 46

28 U.S.C. § 1291 ....................................................................1

28 U.S.C § 1332 .....................................................................1

Va. Code § 8.1A-202 ...............................................................49

Va. Code § 8.2-105 .............................................................58, 59

Va. Code § 8.2-601 .................................................................58

Va. Code § 8.2-606 .............................................................46, 47

Va. Code § 8.2-703 .................................................................46

**Rules**

Fed. R. Civ. P. 56 ...........................................................28, 32, 51

## JURISDICTIONAL STATEMENT

The District Court had jurisdiction over Hanwha-Azdel, Inc.'s ("Azdel")

action for the breach of two contracts against C&D Zodiac, Inc. ("Zodiac")

pursuant to 28 U.S.C § 1332.  Azdel appeals a final order and judgment entered by

the District Court on June 2, 2014.  (JA 2181.)  Azdel further appeals a discovery

ruling made below, denying Azdel discovery from Neenah Technical Materials,

Inc., f/k/a Crane & Company, Inc. ("Crane").  (JA 1254-58.)  This Court has

jurisdiction over this appeal pursuant to 28 U.S.C. § 1291.  Azdel timely filed its

Notice of Appeal on July 1, 2014.  (JA 2182.)

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

I.     The District Court erred in granting Zodiac summary judgment by finding, as a matter of law, that Zodiac had not breached the parties' nondisclosure agreement when Zodiac provided Azdel's competitor with Azdel's pricing, Azdel's developmental product, and a one-of-a-kind, confidential specification developed by Azdel and Zodiac.

II.    Where the California law selected by Azdel and Zodiac's nondisclosure agreement provided a remedy even where Azdel suffered no economic harm, the District Court erred in finding Azdel's lack of lost profits meant Azdel suffered no injury even though Zodiac disclosed Azdel's pricing, prototypes and a jointly developed, confidential specification to Azdel's competitor;

    A.     The District Court further erred in ruling that Azdel suffered no injury where Zodiac agreed in the nondisclosure agreement that breach would harm Azdel; and

    B.     The District Court also erred in ruling on injury and the availability of damages after the matter had been bifurcated and Azdel had been denied discovery on damages.

III.    The District Court erred in ruling that Zodiac did not accept Azdel's 2000GSM Aero-Lite where Zodiac's Quality Department received and inspected a shipment, and where Zodiac used the product, going so far as to certify it with the Federal Aviation Administration.

IV.    The District Court erred in permitting Zodiac to terminate its purchase order for 2,900 sheets of 2000GSM Aero-Lite where

    A.    A specification governed the product, but the Court inappropriately incorporated other statements and representations in contravention of the parties' agreed upon integration clause; and

    B.    The District Court disregarded other provisions of the parties' agreement, protective of Azdel, including a provision requiring Azdel's assent to grounds for termination; and

    C.    Facts in best light to Azdel revealed that Azdel's product met requirements and that Zodiac's complaints were a pretext to cover a fundamental engineering error by Zodiac that made the airline panel too heavy.

V.    The District Court erred in ruling, as a matter of law, that Zodiac was not required to pay for delivered 1320GSM product, even though Zodiac accepted, and used the product, never purporting to reject it.

VI.    The District Court erred in permitting Crane to withhold documents from discovery on Crane's assertion of a common interest privilege with a non-party because Crane and the nonparty shared no common legal strategy.

VII.    In light of the foregoing, the District Court erred in failing to grant Azdel's motion for partial summary judgment

    A.    where it was undisputed that Zodiac provided Azdel's competitor Crane with confidential pricing, and specification in direct contravention of Azdel and Zodiac's nondisclosure and confidentiality agreements (addressed with Question I);

2

B.   where it was undisputed that Zodiac accepted and refused to pay for shipments of 2000GSM Aero-Lite and 1320GSM Aero-Lite (addressed with Questions I, III, and V).

## STATEMENT OF THE CASE

I.   Azdel Files Breach of Contract Claims for Zodiac's Disclosure of Confidential Information and Refusal to Pay for Product.

Azdel brought breach of contract claims under Virginia and California law for Zodiac's violation of the parties' Nondisclosure Agreement ("NDA") as well as for violation of the confidentiality clause of the parties' master agreement.  (JA 89-100.)  The prohibited disclosures occurred when Zodiac provided Azdel's pricing, prototype and other confidential information to Azdel's competitor, Crane.  (JA 2363, 2365, 2367, 2388-89, 2397-99, 2740, 2744, 969-70, 1023-36, 1885-86, 795-97, 800-01, 979-80, 982-84, 1875-76, 2198-2208, 2405, 2417-25, 2428, 2435-44.)  Azdel sought its development costs and disgorgement of Zodiac's ill-gotten profits, remedies provided by California law, as well as equitable relief.  (JA 99-100.)

Azdel also sought payment for two different types of Azdel's developmental material that Zodiac received and used, but refused to pay for.  (JA 95-97.)  Azdel brought claims under Virginia's Uniform Commercial Code for two different weights of Azdel's Aero-Lite$^{TM}$, ("Aero-Lite"), which Zodiac ordered to form into lightweight airline interiors.  Specifically, Azdel sought payment for a 2000GSM weight Aero-Lite, and then a lighter weight 1320GSM Aero-Lite that Azdel

3

created after Zodiac miscalculated the weight of the raw Aero-Lite sheets that Zodiac required.  (JA 95-97, 845-46).[1]

At Zodiac's request, the Magistrate Judge bifurcated proceedings, refusing Azdel discovery on damages.  (JA 64-84, 184-90.)  Azdel appealed this bifurcation to the District Court, but the District Court did not rule on the matter before entering summary judgment, denying Azdel any opportunity to investigate the profits obtained from Zodiac's misuses of Azdel's confidential information.  (JA 195, 2180-81.)

> II.    The District Court Refuses Azdel Discovery Against Crane After Crane Withholds Documents from Its Late Production.

Azdel subpoenaed records from Crane, in part because Azdel believed Zodiac provided Azdel's confidential information to Crane.  (JA 47.)  Only after Azdel filed a Motion to Compel – and the District Court found that Crane had waived its objections to Azdel's discovery – did Crane turn over key emails.  (JA 47-49, 159-70, 2397-99.)  When Crane finally produced documents, Azdel uncovered a smoking gun email showing that Zodiac had disclosed Azdel's pricing to Crane.  (JA 2388-89, 2397-99.)

---

[1] Azdel and Zodiac reached a separate settlement for Zodiac's failure to pay for other developmental weights of Aero-Lite ordered by Zodiac (including 1250GSM and 1350GSM).  (JA 2173.)

4

In that same production, Crane withheld several hundred documents, claiming various privileges. (JA 205-28, 230-31.) Among those were nearly thirty communications with Azdel's resin supplier with whom Crane claimed a common interest privilege. (*Id.*)

Azdel again moved to compel on the grounds that Crane had not demonstrated or even alleged the undertaking of the common legal strategy necessary for the asserted privilege. (JA 196-202.) The Magistrate Judge granted Azdel's Motion to Compel in part, but denied Azdel's challenge to the common interest privilege. (JA 334-35.) Azdel objected to this portion of the Magistrate's order, but the District Court did not rule on the objections prior to dismissing Azdel's case. (JA 336-42, 2180-81.)

III.    The Parties File Cross-Motions for Summary Judgment On a Record that Contains Sharply Conflicting Views of the Underlying Facts.

After extensive discovery, including the proffer of directly conflicting expert opinions, the parties filed cross motions for summary judgment. Azdel filed documents showing that Zodiac disclosed Azdel's pricing (JA 2363, 2365, 2367, 2388-89, 2397-99, 2740, 2744), Azdel's developmental Aero-Lite (JA 969-76, 1023-36, 1885-86), and the specification from Azdel's confidential agreement with Zodiac. (JA 795-97, 800-01, 979-80, 982-84, 1875-76, 2198-2208, 2405, 2417-25, 2428, 2435-44.) Azdel put forward evidence that its products met Zodiac's

5

requirements, including expert testimony that Azdel's product met the necessary specification and the testimony of Zodiac's plant manager that Azdel's products were "certified" and passed required tests. (JA 990-1016, 845.) Azdel also put forward evidence that *Zodiac* had miscalculated the weight requirements of its interior aircraft panels and ordered Aero-Lite sheets that were too heavy from Azdel. This was a critical mistake in an industry where "weight is everything" and this error created a motive for Zodiac to seek to avoid paying for the Aero-Lite. (JA 839, 1714, 1716.)

## IV.    The District Court Grants Zodiac Summary Judgment On All Issues.

### A.    The District Court Rules that Providing Azdel's Pricing Scheme to a Third Party Does Not Implicate Confidentiality Concerns.

In the face of this hotly contested record, the Court granted Zodiac's Motion for Summary Judgment and denied Azdel's partial motion. (JA 2181.) Though the Court was to take evidence in best light to Azdel, the District Court ruled against Azdel on all confidentiality grounds, finding that Zodiac did not violate the parties' non-disclosure agreement when it gave Azdel's confidential pricing to Crane. (JA 2171-72.) It further ruled, in the face of disputed evidence, that Zodiac gave Crane a 1350GSM Aero-Lite prototype, not a 1320GSM Aero-Lite prototype and that the prototype was not confidential because it was commercially available. (JA 2172-

6

73.)  Finally, the District Court ruled that the one-of-a-kind specification developed by the parties for their project was not confidential.  (JA 2169-71.)

With regard to Zodiac's disclosure of confidential pricing, the District Court found the disclosure to be of no moment because "[b]usinesses looking to sell a product commonly research pricing for competing products in setting their own price" and they "commonly use pricing for comparable products as a guide in determining what they want to pay and, unless prices are fixed, to negotiate with vendors."  (JA 2172.)  The District Court rejected Azdel's claim because it would "prevent Defendant from using this common pricing practice and require it instead to determine what it would pay in the absence of any market data."  (*Id.*)  Having ruled that Zodiac's need to "research pricing for competing products" overrode Azdel's bargained for protection of its confidential information, the District Court concluded that Zodiac did not violate the NDA.  (*Id.*)

The District Court also decided Azdel could not have been injured by Zodiac's disclosure of Azdel's confidential information because "Plaintiff's opposition does not show any discussion of Plaintiff's loss of profits, which is the traditional measure of damages for breach of contract."  (JA 2176-77.)  The Court rejected Azdel's damage claims, which sought an alternate remedy provided for by the NDA and California law, but instead concluded that the only way Azdel could show injury was to demonstrate pecuniary loss.  (JA 2177-78.)  In so ruling, the

7

Court disregarded the governing law, Azdel's claim to over $1 million in development costs, and the parties' agreement that in the event of a breach Azdel would be "substantially and irreparably harmed . . ." (JA 2196.)

> B. **The District Court Denies Azdel Any Payment for the Materials Ordered and Used by Zodiac.**

The District Court also ruled that Zodiac had no obligation to pay for any of the 2000GSM Aero-Lite and 1320GSM Aero-Lite Zodiac had ordered - including shipments actually received, used, tested, and certified either internally or through the Federal Aviation Administration. (JA 2156-67.) It further determined that Zodiac could cancel Azdel's purchase order for 2000GSM Aero-Lite because Azdel's product allegedly did not meet Zodiac's expectations and could not go on American Airlines' planes. (JA 2159-61.) The District Court ruled that Zodiac could rely on statements made prior to the time the parties entered the Master Agreement in analyzing Azdel's product and that Zodiac owed Azdel nothing even though:

- The Master Agreement expressly stated that it superseded any prior conversations and agreement (JA 2190-91);

- The Master Agreement set and incorporated a Specification for Azdel's 2000GSM Aero-Lite (JA 1002-03, 2190, 2198-2208);

- The Master Agreement could only be amended by written agreement (JA 2190-91);

- Best light to Azdel revealed its product met all requirements. (JA 850, 1007-12.)

Again, the District Court failed to take evidence in best light to Azdel, finding that its 2000GSM Aero-Lite failed to meet all of Zodiac's expectations. (JA 2159-61.)

·  ·  ·

In summary, the District Court stated that "competition is not prohibited by either the [Master Agreement] or the NDA" in reviewing Azdel's claims that Zodiac violated its contractual confidentiality obligations when it used Azdel's confidential pricing, prototype, and the parties' unique specification to assist Azdel's *competitor.* (JA 2177.) The District Court further concluded that Zodiac had no obligation to pay *anything* for Azdel's products that Zodiac certified and used. This appeal followed.

## STATEMENT OF FACTS

A.   Summary.

The facts, in best light to Azdel, show that Azdel created a lightweight composite sheet which was a raw material that Zodiac could form into aircraft interior walls. Azdel's product complied with the requirements that Azdel and Zodiac set out in their agreements. (JA 850, 1007-12.) Zodiac's Quality Control

9

inspected Azdel's sheets and passed them on to be turned into sidewalls. (JA 1642-44.) An Azdel employee then spent two weeks training Zodiac on new machinery, during which time Zodiac made no complaints about Azdel's product. (JA 1620-21, 1625-30.) Zodiac formed an interior wall; and its personnel looked at it, thinking it "looked good as it sat on the table." (JA 1695-96.) Zodiac then presented it to American Airlines. Only then did Zodiac discover that it had fundamentally miscalculated the weight of the interior wall panels and had ordered the wrong weight composite sheets. (JA 840, 1706, 1708-12, 1714, 1716.)

Under Azdel and Zodiac's contract, Zodiac had already obligated itself to pay Azdel for 2,900 ordered sheets of that product. Caught with a too-heavy product, Zodiac hid its weight miscalculation, blamed Azdel for other supposed-deficiencies in the product, and ultimately refused to pay Azdel – even while certifying Azdel's product with the FAA. (JA 843-45, 1014, 1706, 2581, 2591, 2610.)

At Zodiac's request, Azdel scrambled to help produce an even lighter composite sheet for American Airlines. Zodiac again took Azdel's product, tested and passed this lighter product, and told Azdel it was awaiting "final approval" from American Airlines. (JA 807-08, 957.)

While Azdel awaited news on American Airlines, Zodiac was secretly developing a similar product and negotiating terms of sale with Crane for the

American Airlines project. (JA 2405-06.) Zodiac provided Crane the specification Azdel and Zodiac had created, Azdel's pricing, and Azdel's prototype. (JA 2363, 2365, 2367, 2388-89, 2397-99, 2740, 2744, 969-70, 1023-36, 1885-86, 795-97, 800-01, 979-80, 982-84, 1875-76, 2198-2208, 2405, 2417-25, 2428, 2435-44.) Zodiac violated its confidentiality agreements, but succeeded in getting a product similar to Azdel's that Crane agreed (after seeing Azdel's pricing) to sell below cost. (JA 2379-81, 2386-87, 2390-95, 2402-03.)

Zodiac sandbagged Azdel on its attempts to continue working on the new, lighter weight composite sheet. (JA 1766-75.) As months dragged on, Azdel believed it was simply waiting on American Airlines' final approval. (*Id.*) It had agreed in the Master Agreement to offer Zodiac exclusivity. (JA 2185-86.)

Zodiac refused to pay Azdel. (JA 2250, 2252.) Presented with litigation, Zodiac claimed no obligation to provide Azdel with any compensation for the heavier or lighter Aero-Lite, and Zodiac never compensated Azdel for its serious breaches of Azdel's confidentiality agreements.

B.     Azdel and Zodiac Develop Lightweight Materials for Airline Interiors Over Many Years.

Azdel is based in Forest, Virginia and manufactures thermoplastic composite sheet products. (JA 2184.) Zodiac is a Delaware corporation based in California

11

that, among other things, designs and manufactures interiors for commercial

aircraft.  (*Id*.)

In 2005, Azdel and Zodiac began working together to develop a lightweight

sheet that could form panels for airplane interiors.  (JA 775-77.)  The goal was to

replace heavier, existing interior panels in airplanes that were undergoing

refurbishment, and to provide those same lightweight panels for the construction of

new planes.  (JA 839, 1650-51.)  Because the panels could be formed quickly,

Zodiac could save substantial labor costs and increase its margins.  (JA 830-31,

1000.)  And, because of high fuel costs, airlines sought to reduce weight wherever

possible.  (JA 1592, 1650-51, 2788.)  With a number of large-scale airline

refurbishments on the horizon, Azdel and Zodiac developed and proposed using

their new, unconventional lightweight interiors to reduce airplane weight.  (JA

2184-92.)

C.    Azdel & Zodiac Execute Sales and Confidentiality Agreements
       Around Azdel's Developmental Aero-Lite.

As part of their joint effort, in March 2008, Azdel and Zodiac executed a

master agreement in the form of a Memorandum of Understanding ("Master

Agreement") in connection with American Airlines' refurbishment of its Boeing

757's, as well as in connection with the new Boeing 787 Dreamliner, Airbus 350,

and Northwest Airlines Refurbishment for the Boeing 757.  (JA 2185.)   The

12

Master Agreement also contained a key limitation on Azdel: Azdel was to offer

Zodiac exclusivity for twenty (20) years for these major airline programs.  (JA

2185-86.)

Under the Master Agreement, Azdel was to make the base material (Aero-

Lite) for interior walls consisting of special Aero-Lite in compliance with the

specification attached to the Master Agreement.  (JA 1002-03, 2190, 2198-2208.)

Zodiac's role was to form sidewall panels using heat and pressure, apply a

decorative finish, trim out the panel and finish it by bonding window shades (also

called reveals), air grills, fasteners and related hardware.  (JA 833-36.)  Title to

Azdel's product passed to Zodiac when Zodiac formed the sheets into walls.  (JA

2189.)

> D.    The Master Agreement Required Zodiac to Forecast its Needs for
>        Aero-Lite and Required Zodiac to Purchase Goods Made In
>        Connection with the Forecast.

Because manufacturing lightweight Aero-Lite required long lead times, the

Master Agreement required Zodiac to "provide six-month forecasts to Azdel" that

were "binding in that [Zodiac] will be committed to later issue a purchase order for

not less than the material requirements forecasted . . . ."  (JA 2189 (brackets

supplied, capitalization removed).)  Zodiac's forecasts served as a "trigger [for]

Azdel's supply chain process" requiring Azdel to commit resources to the

manufacturing process, with the obvious guarantee of being paid.  (*Id.* (brackets

supplied, capitalization removed).)  Zodiac was permitted to terminate the Master Agreement and related open orders if "the material does not perform as predicted and is deemed not suitable for [Zodiac's] intended use" and Zodiac gave sixty days' notice; or if a customer requested a return to conventional materials.  (JA 2190 (brackets supplied, capitalization removed).)

E. The Parties Create the Specification for this Project and Include it in the Confidential Master Agreement.

The Master Agreement provided that Azdel was to produce Aero-Lite in compliance with a specification entitled "CDM005-05 Thermoform Plastic Liner, Enhanced Sound Absorption Material Specification," Revision N/C and NC-1 ("the Specification"), which was attached and incorporated into the Master Agreement. (JA 1002-03, 2190, 2198-2208.)  The Specification was new, built around Aero-Lite, and one-of-a-kind; it was developed through an extensive back and forth between Azdel and Zodiac and testing of Aero-Lite. (JA 779, 1000, 1014-15.)  Azdel was specifically mentioned in the Specification, and Azdel peer reviewed it. (JA 787, 2201, 2205.)  The Specification was initialed along with the other pages of the Master Agreement. (JA 2198-2208.)  The confidential Master Agreement attached and incorporated the Specification.  (JA 2190, 2198-2208.)

14

F.     Azdel Warrants Only that Aero-Lite Would Meet the Specification.

In the Master Agreement the "Parties agree[d] that the suitability of the Product for the American Airlines 757 program has been extensively tested and investigated. Azdel warrants only that Products sold to [Zodiac] will conform to [Zodiac's] specifications in effect at the time of the manufacture and agreed in writing . . . ." (JA 2189-90 (brackets supplied; capitalization removed)). Azdel also "expressly disclaim[ed] any warranty of fitness for a particular purpose." (JA 2190 (brackets supplied)).

G.     Zodiac and Azdel Agree to Keep the Specification, Prototype and Other Information Confidential.

Given the developmental nature of Azdel's product, as well as Azdel's significant investment in developing Aero-Lite, the parties included a confidentiality agreement in the Master Agreement and executed a nondisclosure agreement. (JA 2193-96.) The confidentiality clause of the Master Agreement provided that it and all subsequent purchase orders "shall be treated as and kept confidential by both Parties." (JA 2191.) Zodiac expressly agreed not to use this information "for any purpose other than those directly relating" to Azdel and Zodiac's project. (*Id.*)

In the NDA, Zodiac also agreed not to disclose Azdel's confidential information, which the parties agreed "includes, but [was] not limited to designs

15

. . . prototypes . . . plans for development of existing and new technologies . . . [and] information regarding manufacturing costs and pricing . . . ."  (JA 2194.) Zodiac further agreed not to disclose any confidential information disclosed by Azdel to any third party without Azdel's agreement.  (JA 2195.)  Zodiac also was prohibited from using Azdel's confidential information to compete with Azdel. (JA 2196.)

Zodiac agreed that if it violated the NDA, Azdel would "be substantially and irreparably harmed, damages are impossible to ascertain in advance, and monetary damages will not sufficiently compensate" for the breach and that in the event of breach Azdel would be entitled to remedies at law or equity.  (JA 2196.)

H.    The Master Agreement Expressly Disclaims All Other Agreements, and Terms and Conditions of Purchase Orders.

The Master Agreement provided that it was for the duration of the American Airlines 757 project, or until the parties executed some other replacement agreement (which they never did).  (JA 2190.)  It further dictated that it was the only agreement between the parties.  (JA 2191.)  The Master Agreement's integration clause expressly disclaimed any conversations or other understandings between the parties and required that changes or amendments to the Master Agreement be in writing, signed by both parties.  (*Id.*)  By a separate provision, it expressly rejected terms and conditions included in purchase orders.  (JA 2189.)

16

I.    Azdel Produces Panels in Compliance With the Specification But Zodiac Miscalculates the Weight Required By American Airlines.

1.    Zodiac Forecasts A Need for 2,900 Sheets of Aero-Lite And Is Bound to Buy Them.

One of the major projects that Zodiac and Azdel targeted was American Airlines' refurbishment of its 757's.  (JA 2185.)  At Zodiac's request, Azdel developed a 2000GSM weight of Aero-Lite for this project.  Zodiac's own plant manager testified that Azdel's 2000GSM was "[C]ertified, passed the static test, passed the rest of the – the tests that it had to go through."  (JA 843-45, 1014, 1706 (brackets supplied).)  In testing that preceded the Master Agreement, Zodiac also became aware of trade-off that accompanied a lower weight product, including some brittleness.  (JA 2334, 2337-39.)  Zodiac forecasted a need for 2,900 sheets of Aero-Lite in connection with the American Airlines' refurbishment.  (JA 2349-52.)  As required by the Master Agreement, Azdel began producing this 2000GSM Aero-Lite under the forecast, and, in April 2008, Zodiac issued a related purchase order for a total price of $609,522.  (*Id*.)

Azdel produced the 2000GSM Aero-Lite; the raw sheets complied with the Specification and were ready to be formed into interiors.  (JA 850, 1007-12, 1643-44.)  The sheets were not perfectly flat and had a twist.  (JA 833-36, 1659-60.)  But they were still effective for Zodiac's sidewalls as sidewall production involved applying heat and pressure to create a panel that would be supported by a structure.

17

(JA 1007-12, Dkt. 143-4, p. 15-16.)  Accordingly, Azdel delivered the product to Zodiac so that Zodiac could begin making sidewalls for American Airlines.  (JA 856.)

        2.     Zodiac Accepts the Aero-Lite And Forms the 2000GSM Aero-Lite Into Sheets.

Zodiac's Quality Department received the initial shipment of 144 sheets of 2000GSM Aero-Lite on June 5, 2008, and forwarded the material to Zodiac's forming facility to mold into sidewall panels.  (JA 1642-44, 1647.)  Zodiac's procedure for acceptance of a product was to have a receiving inspector examine the paperwork, and match the material's requirements to the material.  (JA 860-61.)

In this case, Zodiac accepted the 2000GSM Aero-Lite (which Zodiac had previously tested and certified).  It received the 2000GSM Aero-Lite and its designated inspector examined the visibly curled material, and then forwarded the 2000GSM Aero-Lite to be formed.  (JA 1642-44.)  Zodiac took title to the shipment, forming the sheets into panels.  (JA 2189, 1642-44.)

Because Zodiac was new to the type of work required to form Aero-Lite into aircraft interiors, Azdel sent personnel to help Zodiac manufacture interior walls for American Airlines to fit check. (JA 1620-21, 1623-30.)  Zodiac did not express

any concerns about Azdel's product to those Azdel personnel, but instead prepared it for American Airlines.  (*Id.*)

> J.    Zodiac Miscalculates the Weight and Discovers It Has Been Working on the Wrong Weight Material for Over a Year.

American Airlines complained that Zodiac's trimmed panel "was heavier than the one they took off."  (JA 840, 1706, 1708-12, 1714, 1716.)  The weight difference was not marginal: the panels Zodiac made were 25% heavier.  (JA 1708-12.)  Zodiac's error was fundamental: "in aerospace, weight is everything . . ."  (JA 839.)

Crucially, Zodiac's own plant manager noted that "Azdel didn't do anything wrong on the weight" and that Zodiac "produced the wrong GSM for" American Airlines.  (JA 839, 844, 1706, 1714.)  Contemporaneous emails from within Zodiac showed a dawning realization that it "failed to weigh the 757 panel to see what weight" Zodiac needed to satisfy American Airlines.  (JA 843, 1706, 1714.)  In fact, Zodiac had been working with the "wrong GSM material for over a year." (*Id.*)  Because of the forecasting provision in the Master Agreement, Zodiac was bound to buy the 2,900 hundred sheets ordered from Azdel.  (JA 2188-89, 2350-51.)  Azdel, in fact, produced 2,537 of those sheets.  (JA 850, 853.)

American Airlines also raised concerns about brittleness in the sidewall which was caused when Zodiac – new to forming Aero-Lite – scored the panel

19

during the lamination process. (JA 1656, 1675-76, 1703-04.) American Airlines ultimately identified eleven issues with Zodiac's sidewall: ten were the responsibility of Zodiac and were either unrelated to the physical properties of the raw Aero-Lite sheet or were caused by Zodiac's scoring of the material, or Zodiac's weight miscalculation. (JA 1603-09, 1675-76, 1703-04.) The eleventh complaint American Airlines had with Zodiac's sidewall was its "slight twist" which derived from the Aero-Lite sheet, although American Airlines stated that its decision not to use Zodiac's far-too-heavy sidewall was not caused by the slight twist. (*Id*.)

When Zodiac's Vice President of Marketing learned that Zodiac purchased the wrong (heavier) material from Azdel, he instructed, too late, to "put a stop on that asap." (JA 1714.) Knowing they were bound to pay for 2,900 sheets, Zodiac told its employees they "need[ed] to get creative on this." (JA 1716 (brackets supplied).)

K.   **Zodiac Does Not Inform Azdel of Zodiac's Weight Mistake; But Tells Azdel a Lighter Weight Product is Required.**

1.   **Zodiac Hides Its Weight Miscalculation.**

Following American Airlines' fit check, Zodiac's James Del Pinto sent an email to Christopher Willis, Azdel's Director of Sales and Marketing regarding the status of the 757 Program. (JA 884-87.) Del Pinto claimed a lighter Aero-Lite was

required because American Airlines was going to demand more reinforcement on the panel as a result of the curl.  (JA 886.)  Zodiac also told Azdel that providing a 20% lighter product to American Airlines was a proactive measure Azdel could take to "give American Engineering more" and "rectify our image and mitigate the bad first impression" that American Airlines had supposedly formed.  (*Id.*)

2.    <u>Zodiac Promises to Use the 2000GSM Aero-Lite.</u>

In that same email, Del Pinto also said that he was "investigating a number of projects to find a more suitable application for" the 2000GSM material.  (JA 886.)  He noted that the 2000GSM Aero-Lite "looked great as it sat on the table . . ."  (JA 884-85.)  Belying Zodiac's claim that 2000GSM Aero-Lite was a troubled product, weeks later, Zodiac incurred great expense to test and certify the 2000GSM Aero-Lite under procedures of the Federal Aviation Administration.  (JA 1014.)  Zodiac also, again, proposed American Airlines use the 2000GSM Aero-Lite in its airplanes.  (JA 1611-12.)

Zodiac did not own up to its miscalculation even later, as Azdel and Zodiac delved into making a lighter weight product.  Instead, Zodiac falsely told Azdel that American Airlines had been responsible for a weight miscalculation and that American Airlines had "apologized" to Zodiac.  (JA 1567, 1734.)

21

3.     Zodiac Generates After the Fact Nonconformance Reports, but Does Not Give the Reports to Azdel.

Twelve days after Del Pinto agreed to find other applications for the 2000GSM Aero-Lite, Zodiac generated "nonconforming reports" that claimed that the 2000GSM product did not meet the parties' Specification.  (JA 790-91, 895-96.)   Zodiac did not provide the nonconforming reports to Azdel.  (JA 901.)  Its quality inspector did not know the grounds for the nonconforming reports, but instead prepared them at the direction of Del Pinto.  (JA 865.)  The nonconforming reports claimed that Azdel's products did not meet the Specification, including that they did not have the required flatness – a metric not found in the Specification and never communicated to Azdel because it was only found in an internal Zodiac document.  (JA 895-96.)  Zodiac later provided a purchase order purporting to cancel its order for 2000GSM Aero-Lite.  (JA 791, 841, 901, 2352-54.)

Zodiac refused to pay for the 2000GSM Aero-Lite material it had forecasted, ordered and used under the Master Agreement.

L.     Azdel Develops a New, Lighter Aero-Lite.

Through 2008 and 2009, Azdel and Zodiac worked together to develop a new, lighter weight Aero-Lite sheet.  (JA 788-89, 841.)  Azdel provided a number of different weights, including 1200 and 1350GSM Aero-Lite.  (JA 788-89, 2358-59, 2361, 2363, 2365, 2367, 2369-71.)  Azdel's 1320 and 1350GSM Aero-Lite

22

were developmental products, not commercially available, and were noted as such to Zodiac. (JA 2920-21.)

Committed to the project, Azdel ultimately developed a 1320GSM Aero-Lite specifically for the AA 757 Program. (JA 788-89, 841.) In September 2008 and April 2009, Azdel issued sample quotations and pricing letters for Zodiac's purchase of the new 1320GSM Aero-Lite. (JA 2358-59, 2361, 2363, 2365, 2367.) The September 2008 Pricing Letter included a formula for calculating the price of various weights of Aero-Lite by adding incremental dollar amounts to a baseline price. (JA 2363.) As part of the American Airlines' program, and per the request of Zodiac, the 1320GSM Aero-Lite fell under the Master Agreement. (JA 841, 2358-59, 2361, 2365, 2363, 2367.) The pricing and quotation letters were all labeled by Azdel as "**CONFIDENTIAL.**" (*Id.*)

On April 24, 2009, Zodiac issued a purchase order for twenty sheets of the developmental 1320GSM Aero-Lite with woven glass scrim. (JA 2369-71.) Azdel and Zodiac conferred, as Azdel was only in a position to generate eight sheets at that weight. (JA 808, 811, 1550, 1601.) Zodiac determined it could carry out its required work with the eight sheets in mid-August 2009. (JA 1601.) Zodiac formed panels with the 1320GSM Aero-Lite (JA 807-08, 1550-1601), and conducted the necessary testing "under American Airlines conditions." (JA 957.)

23

Around August 31, 2009, Zodiac informed Azdel the panels passed testing. (*Id.*) While not agreed to by Azdel, Zodiac told Azdel it would pay for the product after it passed American Airlines' testing. (JA 1768.) Zodiac never provided any record of such testing. Azdel invoiced Zodiac $6,000 for the eight sheets but Zodiac never paid for any of the 1320GSM. (JA 2373, 2250, 2252.)

M.    Zodiac Gives Azdel's Competitor, Crane, Azdel's Confidential Information.

Unbeknownst to Azdel, Zodiac had started conversations with a third party, Crane. (JA 802, 1759, 2405-26.) Crane had not previously created the kinds of materials that Azdel marketed. But Zodiac began to assist Crane in developing Composite Aerospace Board ("CAB"), an Aero-Lite knockoff with the same end use. (JA 802, 1759.)

Zodiac's Del Pinto disclosed to Crane the performance criteria contained in the Specification developed by Azdel and Zodiac, indicating if Crane could meet the requirements, Zodiac would do business with Crane. (JA 795-97, 800-01.) Crane ended up developing CAB to meet the Specification (JA 979-80, 2405, 2417-25, 2428, 2435-44), the same Specification that Azdel and Zodiac negotiated and developed around Aero-Lite. (JA 2198-2208.)

Zodiac's Del Pinto undertook conversations with Crane under the mistaken – and bizarre – belief that he had purchased Azdel's patent for Aero-Lite over the

24

internet for a dollar. Del Pinto wrote in an email "Azdel lapsed on the patent for Aerolite [sic], and I bought it for a $1 registration fee." (JA 1759.) Del Pinto went on to say he had given the project to Crane; he gave this explanation in an email exchange about providing Aero-Lite to Crane for testing. (JA 1386-88.) In fact, Del Pinto had not registered or gained rights to the Aero-Lite patent. He had registered for a search engine that allowed him to search for the patent. (JA 1686-87.)

Zodiac allowed Crane to test the new Crane product against Azdel's developmental product. (JA 959-76, 1023-36.) In March, 2010 Crane provided Zodiac a report of Crane's testing (at Zodiac's facility) of Crane's product against Azdel's developmental Aero-Lite. (JA 1023-36.) The report reflected that Crane had access to 1320GSM and/or 1350GSM Aero-Lite. (JA 1026.) Crane used that developmental material as a control to develop its new product. (JA 1023-36.) Crane's notes indicated that the part they made from the Aero-Lite sheet "looked good." (JA 1026.) Zodiac also later shipped Crane a formed window panel made of the Aero-Lite, and Crane used it to develop the backing on its own product. (JA 961-63, 969, 973-75, 1885-86.)

During negotiations with Crane, Zodiac disclosed the prices Azdel had set for its sales of 1320GSM Aero-Lite to Zodiac. (JA 2358-59, 2361, 2363, 2365, 2367, 2388-89, 2397-99, 2740, 2744.) This pricing was drawn from Azdel's

purchase letters, and Sample Quotations and Pricing Letters, all of which Azdel had designated as confidential under the NDA.  (*Id.*)  As stated on the face of the email and confirmed by Crane's Product Manager, Bruce Andrews, the pricing information originated from Zodiac's General Manager, Danny Martin, who routed it through Azdel's resin provider to Crane ("Here's a chart with pricing information that came from Danny (C&D [Zodiac].  He had sent it to Paul Siebert first then he forwarded to me."). (JA 2397 (brackets supplied).)

The spreadsheet included tiered pricing identical to Azdel's confidential Pricing Letters for 1300GSM Aero-Lite ordered in quantities of 1,400 and 2,600 sheets.  (JA 2358-59, 2361, 2363, 2365, 2367, 2388-89, 2397-99, 2740, 2744.)  Crane ultimately priced its version of Aero-Lite below *its* cost and *sold it at a loss* to secure Zodiac's business.  (JA 2379-81, 2386-87, 2390-95, 2402-03.)

Later, on November 19, 2010, Crane and Zodiac entered into their own Memorandum of Understanding.  (JA 2405-26.)  Zodiac and Crane attached the Specification that Azdel helped create **and that mentioned Azdel specifically** to Crane's agreement.  (JA 2417-25.)

Crane's product, CAB, became the only other product like Aero-Lite in existence. (JA 1594.)  CAB was developed to meet the same Specification as Aero-Lite (JA 1664-68, 1681-82, 1684-85, 1779-80), had virtually the same target weight as Aero-Lite (JA 1783), had a similar woven glass scrim (JA 1784-89),

26

utilized the same thermoforming process (JA 1583), used the same German company to consolidate the material (JA 2509, 2395), was developed in a fraction of the time Aero-Lite was developed (JA 1108-10, 2529), and had the same end use (JA 1688-90) for the same contracts with Zodiac's customers as Azdel's Aero-Lite.  (JA 1670, 2405-2426.)  At the time dispositive motions were filed below, Zodiac was molding CAB sidewalls for Delta and intended to use CAB sidewalls in its awarded programs.  (JA 1584, 1670.)

N.    Azdel's Continued Efforts To Manufacture And Sell Aero-Lite.

Not realizing that Zodiac sought to replace Azdel by creating a competitor using Azdel's prototype, pricing and the jointly developed specification, Azdel continued to attempt to work with Zodiac and to sell its Aero-Lite.

Azdel waited on news of American Airlines' testing for a full year after Azdel delivered 1320GSM and learned that the material passed Zodiac's testing. (JA 1766-75.)  Azdel repeatedly inquired about the status of the AA 757 Program (for which the 1320GSM had been developed), as well as the Continental program (for which Zodiac indicated it would utilize the 2000GSM Aero-Lite ordered in June 2008).  (*Id.*)  Zodiac led Azdel as Zodiac was working with Crane on CAB. (*Id.*)

27

After CAB's announcement, Azdel pressed Zodiac to pay for the 2000GSM and the 1320GSM Aero-Lite.  (JA 2250, 2252.)  Zodiac refused and this suit followed.

## STANDARD OF REVIEW

The Court reviews a district court order granting summary judgment *de novo*, viewing the evidence in the light most favorable to the non-moving party. *Rosetta Stone Ltd. v. Google*, 676 F.3d 144, 150 (4th Cir. 2012).  Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a). "A genuine question of material fact exists where, after reviewing the record as a whole, a court finds that a reasonable jury could return a verdict for the nonmoving party."  *Dulaney v. Packaging Corp. of America*, 673 F.3d 323, 330 (4th Cir. 2012).  In conducting its review, the Court "do[es] not weigh the evidence." *Hardwick ex rel. Hardwick v. Heyward*, 711 F.3d 426, 434 (4th Cir. 2013), *cert. denied* 134 S.Ct. 201, (Oct. 7, 2013) (quotation omitted); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict.").

28

## SUMMARY OF ARGUMENT

The District Court erred in granting summary judgment, as it set aside clear evidence that Zodiac violated the parties' non-disclosure agreement and determined that Zodiac had no obligation to pay for Aero-Lite it ordered and used, thereby inappropriately weighing evidence. *Anderson*, 477 U.S. at 255.

First, the District Court misapprehended the record by ignoring that Zodiac provided Crane with information protected by the NDA and the Master Agreement, including an email disclosing Azdel's confidential pricing. (JA 2169-73.) The District Court concluded that Azdel's confidential pricing, protoype, and jointly negotiated specification were not confidential and did not merit protection. In reviewing and parsing the record, the Court impermissibly weighed evidence, denying Azdel the benefit of a reasonable jury's judgment. *Anderson*, 477 U.S. at 255. (*Infra* at 32-41.)

The District Court further reasoned that Azdel's pricing information could not be confidential, because protecting pricing information would stop businesses from researching prices. (JA 2172.) This rationale directly contradicts California and Virginia law which expressly permits parties to contract to hold certain information confidential – and then holds them to that bargain. *Ajaxo Inc. v. E*Trade Group, Inc.*, 135 Cal.App.4th 21, 62 n.38 (6th Dist. 2005); *Eden Hannon & Co. v. Sumitomo Trust & Banking Co.*, 914 F.2d 556, 561-62 (4th Cir. 1990).

29

The Court's sweeping logic would render ineffective all confidentiality agreements relating to price. (*Infra* at 35-36.)

The District Court also ruled that Azdel could not bring an action for violation of the confidentiality agreements unless it showed some clear economic loss. Azdel's evidence demonstrated that Zodiac gave the fruits of Azdel's million dollar development investment to Azdel's competitor. Even ignoring these seven figure development costs, the California law selected by the parties (JA 2196) specifically provides that one may be injured by a breach of a confidentiality agreement even where *no economic harm is suffered. See, e.g., Ajaxo*, 135 Cal. App. 4th at 56-57; *Foster Poultry Farms, Inc. v. Suntrust Bank*, 377 Fed. App'x 665, 668 (9th Cir. 2010). Moreover, Zodiac expressly agreed in the NDA that if it violated the agreement, Azdel would be injured. (JA 2196.) The District Court's failure to apply applicable law and causation standards is a clear error of law, meriting reversal. (*Infra* at 41-46.)

The District Court also wrongly concluded that Zodiac did not have to pay for Azdel's products. With respect to the 2000GSM Aero-Lite, the Court ruled that Zodiac could cancel its purchase order because Azdel's product did not meet necessary standards. In so doing, the District Court construed the Master Agreement as requiring Azdel's product to meet expectations and standards not included in the Master Agreement. (JA 2160.) This was error where the Master

30

Agreement set a specification to govern 2000GSM Aero-Lite, was fully integrated, and disclaimed prior representations and side agreements, required modifications to be in writing, and noted that Aero-Lite had been extensively investigated.  (JA 2189-91.)  (*Infra* at 50-53.)  This reasoning was emblematic of the decision below, which failed to apply provisions of the Master Agreement protective of Azdel. (*Infra* at 47-49 and 50-57.)

Further, the District Court resolved disputed factual questions about the quality of Azdel's product and American Airlines' on-going interest in Aero-Lite, rather than taking evidence in best light to Azdel.  (*Infra* at 53-56.)  The Court also ruled Zodiac had no obligation to pay for shipments of 2000GSM Aero-Lite and 1320GSM Aero-Lite that Zodiac *actually used.*  (JA 2156-67.)  Here, the District Court misapprehended Virginia's law on acceptance under the perfect tender rule. (*Infra* at 58-59.)

Finally, the Court permitted Crane to withhold discovery under the common interest or joint defense privilege, even though Crane had previously sought to withhold a smoking gun pricing disclosure email and Crane demonstrated no joint legal strategy.  (*Infra* at 59-61.)

The District Court's decision should be reversed.

31

# **ARGUMENT**

I.    The District Court Erred in Finding that Zodiac Did Not Disclose
      Azdel's Confidential Information, Where the Evidence In Best Light
      <u>to Azdel Established Multiple Breaches of the Parties' Agreements.</u>

California law has two maxims applicable to nondisclosure agreements: "He

who takes the benefit must bear the burden," and "[f]or every wrong there is a

remedy." *Ajaxo*, 135 Cal.App.4th at 55 (citing Cal. Civ. Code §§ 3521, 3523); *c.f.*

*Eden Hannon*, 914 F.2d at 563-64 (applying Virginia law); *Snepp v. United States*,

444 U.S. 507, 514-16 (1980) (same).  By ignoring Azdel's direct evidence that

Zodiac violated the NDA, and ruling that even if Zodiac had disclosed confidential

information that Azdel suffered no injury, the District Court violated Federal Rule

of Civil Procedure 56 and ignored California law's insistence that nondisclosure

agreements be enforced.

A.    The District Court Erred In Ruling that Zodiac Did Not Breach
      the NDA in the Face of Direct Evidence That Zodiac
      <u>Wrongfully Disclosed Azdel's Pricing.</u>

Parties to a business transaction commonly designate sensitive information

as protected under confidentiality agreements.  *See, e.g., Ajaxo*, 135 Cal.App.4th

21, 62 n.38; *Eden Hannon*, 914 F.2d at 562.  The Court below determined that

"[a]bsent misuse of *protected* proprietary information" Zodiac was free to compete

with Azdel, or to buy from Azdel's competitor.  (JA 2168 citing *Sl Montevideo*

*Tech., Inc. v. Easton Aerospace LL*, 491 F.3d 350, 353-54 (8th Cir. 2007)

32

(emphasis added)).  But the record clearly reveals that Zodiac disclosed protected information in violation of a contract.

The NDA stated that Azdel "desires to disclose to [Zodiac] certain . . . financial . . . and commercial" information, and as a result wanted confidentiality. (JA 2194.)  The parties specifically agreed in the NDA that "manufacturing costs and pricing" as well as other proposals and plans were confidential.  (*Id.*)  Zodiac agreed in the NDA to "keep the Confidential Information disclosed to it confidential . . . ." (*Id.*)

But Zodiac provided Azdel's pricing information to a third party, Crane, in a spreadsheet entitled historic pricing data.  (JA 2388-89, 2397-99.)[2]  Azdel had transmitted that pricing information to Zodiac in two pricing letters, each labeled confidential.  (JA 2363, 2365, 2367.)  A comparison of Azdel's letters and the spreadsheet reveals Zodiac's disclosure:

---

[2] Zodiac routed the information through Azdel's resin producer; there was no dispute below that the information originated with Zodiac.  The face of the email read "Here's a chart with pricing information that came from Danny (C&D [Zodiac])."  (JA 2388-89, 2397-99 (brackets supplied).)



(JA 2363, 2367; *see also*, JA 2365.)

(JA 2399.)  Azdel's pricing was the only "history" of pricing; Zodiac shared

Azdel's confidential information.

Rather than enforce the terms of the NDA, the District Court ruled Zodiac's

disclosure of Azdel's information was irrelevant because, while Zodiac's

34

spreadsheet included some of Azdel's prices, Zodiac had mixed the information

with other prices that, while coming close, did not exactly match Azdel's prices.

(JA 2172.)  The District Court did not cite to a single legal authority for the

proposition that commingling disclosures from a confidential document with

misinformation immunizes the wrongfully disclosing party from liability.  Zodiac

disclosed Azdel's confidential information; hiding it among other data does not

change that this is a breach of the NDA.

The District Court decided that even if Zodiac violated the NDA, it did not

matter because:

> Businesses looking to sell a product commonly research
> pricing for competing products in setting their own
> prices.  Likewise, businesses looking to purchase a
> product commonly use pricing for comparable products
> as a guide in determining what they want to pay and,
> unless prices are fixed, uses those figures in negotiating
> pricing with vendors.  Plaintiff's argument, which is
> essentially that its prices cannot be used by Defendant for
> any purpose, would prevent Defendant from using this
> common pricing practice and require it instead to
> determine what it would pay in the absence of any
> market data.

(JA 2172.)  The District Court's logic would render all confidentiality agreements

for pricing meaningless.

Zodiac specifically agreed *not* to disclose Azdel's financial information.

While in the normal course of business a company may use market data to price its

product, it may not do so when such action violates a nondisclosure agreement.

Both California and Virginia specifically permit parties to bargain to protect

information exchanged in business transactions. *Ajaxo*, 135 Cal.App.4th at 62

n.38; *Eden Hannon*, 914 F.2d at 561-62. By contrast, the District Court's implicit

conclusion is that Zodiac's need to research prices in its negotiation with Azdel's

competitor overrode its promises to Azdel. It is precisely because a competitor

may research prices to gain competitive advantage that parties negotiate

confidentiality agreements. There is no factual dispute that Zodiac disclosed

Azdel's confidential pricing; the District Court's ruling should be reversed as a

matter of law and Azdel is entitled to judgment as a matter of law as to Zodiac's

violation of the NDA.

### B.  Zodiac Violated the NDA When It Provided Crane with Azdel's Developmental 1350GSM Weight Aero-Lite.

The District Court also erred in ruling that Zodiac did not violate the NDA

when it provided Azdel's prototype, lightweight Aero-Lite to Crane. Under the

NDA, Zodiac agreed to keep all prototypes confidential, and not to provide them to

third parties. (JA 2194-95.) Azdel's interest was obvious. Whether or not Zodiac

opted to use Azdel's product, Azdel did not want to be in the position of having

invested in the development of a product that would be used by a competitor. The

District Court erred in ruling on this matter at summary judgment. The evidence in

best light to Azdel demonstrated that the material Zodiac gave to Crane was

developmental and *not* commercially available. The "weighing of the evidence,

and the drawing of legitimate inferences from the facts are jury functions, not those

of a judge, whether he is ruling on a motion for summary judgment or for a

directed verdict." *Anderson*, 477 U.S. at 255. *See also Hardwick*, 711 F.3d at 433-

34.

The District Court resolved two factual disputes against Azdel. First, the

District Court ruled that Zodiac did not give Crane 1320GSM Aero-Lite. (JA

2173.) But the record clearly showed that Crane tested what Zodiac called

1350GSM Aero-Lite and that Zodiac sometimes referred to 1320GSM Aero-Lite

as 1350GSM Aero-Lite because of the application of an experimental backing.

(JA 1850, 969-76, 1023-26.) Taking the evidence in best light to Azdel, the weight

disclosed by Zodiac was 1320GSM Aero-Lite.

Second, and in the alternative, the District Court erred in finding that

Azdel's 1350GSM Aero-Lite was commercially available and thus not protected

by the NDA. Notably, Crane did not dispute using Azdel's product. Its

representative testified that Crane used Aero-Lite in creating a product that rivaled

Aero-Lite. (JA 959-76.) After prodding, Crane's representative also

acknowledged that Zodiac gave Azdel's product to Crane. (JA 961-64.) The

dispute was as to whether Azdel's product was protected by the NDA. The

evidence in best light to Azdel showed that the 1350GSM Aero-Lite was not

commercial. Azdel provided all low weight Aero-Lite to Zodiac under a pricing

letter that noted:

> AZDEL, Inc. is pleased to provide C&D Zodiac, Inc. with this quotation to produce Aero-Lite Composite Sheet samples for the American Airlines 757 refurbishment program.
>
> AZDEL understands that there has been a significant amount of effort and investment put into this program and that our companies are at a critical point in achieving Aero-Lite's acceptance. We also recognize that the Aero-Lite product's weight and load performance are critical to serving this application's requirements. However, a lower weight product (<1500 gsm) has not been validated in this application, still AZDEL is committed to providing C&D Zodiac with this game changing technology for the Aircraft industry.

(JA 2920.) Azdel's notation that the low weight product was "not validated" and

came in "samples" was emblematic of the fact that the product was not

commercial. (*Id.*) Further, nothing in the record indicated that Azdel's 1350GSM

product was advertised or could be purchased on the market from Azdel or anyone

else. Instead, the record revealed a shuffling of Azdel's products between Crane

and Zodiac. (JA 959-76, 1023-36, 1885-86.) Zodiac had again created precisely

the outcome Azdel negotiated to avoid through the NDA. Azdel's own prototypes

were used to aid a competitor.

The District Court evaded this conclusion by determining, in the face of

conflicting evidence, that Crane received commercial Aero-Lite. It ignored

Azdel's purchasing letter, and instead relied upon evidence that ought to have been

evaluated by the fact finder. Chief among the pieces of evidence crying out for a

jury's review is Crane's testimony that the Aero-Lite was commercially available.

38

Crane's witness expressed that the Aero-Lite it used was commercial *after* taking a break with his counsel, when his attorney requested that the witness be permitted to add to prior testimony.  (JA 959-60.)  Crane's witness went on to conspicuously interject that the Aero-Lite was commercial over and over again – whether responsive to the question asked or not.  (JA 959-70.)  But Crane's representative could not recall who told him the product was commercial and only eventually acknowledged getting the material from Zodiac.  (JA 961-64.)

Azdel was entitled to have a jury weigh Crane's witness's self-serving statements, as well as the question of which Aero-Lite(s) Zodiac gave to Crane. *Anderson*, 477 U.S. at 255.  By short-circuiting proceedings, Azdel was again deprived the benefit of the NDA while Zodiac and Crane got the benefit of Azdel's development, research and testing.

C.    The Specification Disclosed by Zodiac Was Confidential.

There was no dispute below that Zodiac had disclosed the Specification to Crane.  The only dispute was whether the Specification was part of the Master Agreement and thus confidential.

Section 12 of the Master Agreement provided that "[t]his MOU [Master Agreement] and any subsequent PO's shall be treated as and kept confidential by both Parties."  (JA 2191.)  It further stated that they could "only be disclosed to either of the Parties' employees, agents, or third parties who have a legitimate need

to know" and that such information "is not to be used for any other purpose other than those directly relating to this MOU . . . ." (*Id.*)  The District Court erred, because it concluded that the Specification was not a part of the Master Agreement and thus not protected under the agreement's confidentiality clause.  (JA 2169-71.)

"[W]here two papers are executed at the same time or contemporaneously between the same parties, in reference to the same subject matter, they must be regarded as parts of one transaction, and receive the same construction as if their several provisions were in one and the same instrument." *Countryside Orthopaedics, P.C. v. Peyton,* 261 Va. 142, 151-52, 541 S.E.2d 279, 284 (Va. 2001).  The Specification was initialed as part of the Master Agreement and it was attached to and referenced in the signature page of the agreement.  (JA 2192, 2197-2208.)  Moreover, the Specification was referred to and briefly discussed in the main body of the Agreement, with a reference again to the longer Specification appended.  (JA 2190.)  Indeed, Zodiac admitted in its requests for admission that the complete Master Agreement was comprised of the agreement and its attachments, including the Specification.  (JA 988.)

The District Court ruled otherwise at summary judgment, contending that the Specification was not part of the Master Agreement for purposes of the confidentiality clause.  Its rationale was that the Specification belonged to Zodiac. Yet ownership of documents had no salience under the Master Agreement.  The

40

agreement's limitation encompassed "both parties" in its requirement that confidential information not be released.  (JA 2191.)  The Specification was the result of a significant back and forth between Azdel and Zodiac.[3]  (JA 779-86, 1000, 1014-15.)  It was one-of-a-kind, built around Aero-Lite, created especially for the projects that were under the Master Agreement.  (*Id*.)  Azdel went so far as to peer review the Specification, which referenced Azdel in its text.  (JA 787, 2201, 2205.)  Azdel had every reason to bargain to limit disclosure of the Specification, even if Azdel did not itself own it.  The District Court erred as a matter of law in ruling otherwise.

## II.      The District Court Erred in Ruling that Zodiac's Wrongful Disclosure Did Not Injure Azdel Where California Law Recognizes Such Harm.

The District Court further applied the wrong standard for injury in ruling that Azdel was not entitled to damages for breach of the nondisclosure agreements because, the Court reasoned, Azdel demonstrated no economic loss and therefore no injury.  (JA 2175-79.)  California law specifically provides for disgorgement of profits and development costs for breaches of nondisclosure agreements where the victim of the disclosure cannot show lost profits.  *See e.g., Ajaxo Inc.*, 135 Cal.App.4th at 55-57; *Foster Poultry Farms*, 377 Fed.App'x at 665-69.  The Ninth

---

[3] Zodiac argued below that the Specification was proprietary to it.  However, for purposes of summary judgment, the record shows that the Specification was jointly developed around Aero-Lite, peer reviewed by Azdel and confidential.

Circuit ruled that disgorgement is available even where the victim suffered "*no economic harm . . . .*" *Foster Poultry Farms*, 377 Fed.App'x at 668.[4]  In disgorgement cases, "[t]he presence or absence of but-for causation is not necessarily determinative of unjust enrichment." *Uzyel v. Kadisha*, 188 Cal.App.4th 866, 894 (2nd Dist. 2010) (analyzing disgorgement remedy in breach of fiduciary duty case).  The disgorgement remedy is supposed to compensate the victim and also create "incentives" for others to observe their obligations. *Id.*

A.    Zodiac Injured Azdel When It Aided Crane With Azdel's Confidential Information.

The District Court reasoned that Azdel had no injury because it showed no evidence of "loss of profits, which is the traditional measure of damages for breach of contract."  (JA 2177.)  But loss of profits simply is not determinative of whether disgorgement is available.  It does not matter that the victim of the disclosure suffers no change in financial position.  For example, in *Ajaxo*, E*Trade disclosed Ajaxo's trade secrets and propriety information to a third party.  The reviewing court noted that:

_____

[4] Though the NDA selects California law, the outcome is the same under Virginia law.  Courts analyzing Virginia law have applied a constructive trust for book profits where that book was published in violation of a confidentiality agreement, *Snepp*, 444 U.S. 507, 511-15 (1980) (per curiam) (applying Virginia law), and for ill-gotten profits from breach of a non-competition agreement. *Eden Hannon*, 914 F.2d at 563-64.  In each case, the victim of the breach could not show lost profits, but was still entitled to a remedy.

42

> Here, assuming that E*Trade had performed on the
> NDA, i.e. had kept Ajaxo's trade secrets and proprietary
> information confidential, Ajaxo would have been in
> exactly the same position before it entered into the NDA
> as it would have been after negotiations broke down,
> except it would have kept its trade secrets and proprietary
> information away from [the third party].

*Ajaxo*, 135 Cal.App.4th at 56-57 (brackets supplied).  In that case "Ajaxo

conferred a benefit on E*Trade by giving E*Trade Ajaxo's trade secrets and

proprietary information." *Id*. at 57.  "By breaching the NDA, E*Trade gave to [the

third party] information that, in due course, saved E*Trade a lot of money." *Id*.

As a result, E*Trade was required to disgorge $1.29 million to compensate Ajaxo

for development costs.  *Id.*

Similarly, in *Foster Poultry Farms*, the Ninth Circuit affirmed the Eastern

District of California's decision requiring Suntrust to disgorge its profits from a

financial deal involving Foster Poultry Farms because Suntrust disclosed Foster

Poultry Farm's financial information to a competitor.  *Foster Poultry Farms,* 377

Fed. App'x at 669.  The Ninth Circuit found significant that "not only did Foster

not get the benefit of the bargain of the confidentiality agreement, but SunTrust

misused Foster's information *for its own profit*." *Id.* (emphasis in the original).

The Court held that "under California law, a defendant's unjust enrichment can

satisfy the 'damages' element of a breach of contract claim, such that disgorgement

is a proper remedy." *Id.*

43

Zodiac agreed that if it violated the NDA, that Azdel would "be substantially and irreparably harmed, damages are impossible to ascertain in advance, and monetary damages will not sufficiently compensate the disclosing Party." (JA 2196.) Below, Azdel demonstrated that Zodiac provided Azdel's pricing, developmental product, and the jointly developed Specification to Crane. (*Supra* 32-41.) Zodiac thus created a competitor to Azdel and to Aero-Lite. Crane ultimately priced its Aero-Lite competitor below Crane's costs in order to obtain Zodiac's business. (JA 2379-81, 2386-87, 2390-95, 2402-03.) Zodiac purchased Crane's product, formed it into sidewalls and sold it to American Airlines. This obviously benefitted Zodiac, as it allowed Zodiac to obtain necessary sheet product below the vendor's cost, and to resell the furnished sidewall to its customer, presumably for a profit. Azdel, meanwhile, had spent years and over $1 million in development costs, having originally started to work with Zodiac on the project in 2005. (JA 775-77, 853-54.)[5] Azdel received nothing from Zodiac or Crane for the use of its information.

---

[5] The Court further ignored that Azdel had promised "exclusivity" to Zodiac. (JA 2184-85.) If Azdel had tried to make sales to others while Zodiac was misinforming Azdel about the delay, such conduct would have violated the parties' agreement.

44

B.    The District Court Erred in Resolving Fact Questions About Damages that Were Contested and Irrelevant And Where Azdel Had Been Denied Discovery on Damages.

The District Court erred in concluding that Azdel could not obtain relief on the grounds that Azdel purportedly left the aerospace market. The record showed that Azdel continued to pursue placement of the 1320GSM Aero-Lite in the aerospace industry for at least a year after Zodiac told Azdel that Azdel's product had passed Zodiac's testing. (JA 1766-75.) Moreover, Azdel's ability to sell Aero-Lite is related to lost profits or cover, which – again – is not the measure of injury for the disgorgement and constructive trust remedies sought.

In any event, the District Court also erred for purposes of summary judgment in faulting Azdel for not selling to others, where Zodiac led Azdel to believe it was continuing to work with Azdel. The Master Agreement required Azdel to "offer" Zodiac exclusivity of supply. (JA 2184-85.) In order to offer exclusivity, Azdel could not provide Aero-Lite to others for the major airline projects noted in the Master Agreement. Azdel was thus caught in a position where Zodiac refused to pay for the product it had received and the Master Agreement barred Azdel from selling to others.

Finally, the District Court erred in determining that Azdel could not obtain disgorgement of profits, development costs, and injunctive relief. The District Court bifurcated this matter and denied Azdel discovery on damages. (JA 184-90.)

45

The record was not complete as to damages and any decision about causation and the categories of available damages was premature. Available damages should not have been weighed by a factfinder until after damages discovery.

·  ·  ·

As it was, the District Court short-circuited the underlying matter, resolving factual disputes against Azdel and depriving it of its bargained for benefit under the NDA. In so doing, it violated California's maxim that "[f]or every wrong there is a remedy" and allowed Zodiac to benefit from the value of Azdel's property and work in exchange for nothing. *Ajaxo,* 135 Cal.App.4th at 55 (citing Ca. Civ. Code § 3523). The ruling should be reversed.

III.    Pursuant to Va. Code  § 8.2-606(1) Zodiac Must Pay for the 144
        Sheets of Aero-Lite it Accepted.

Where a buyer accepts goods, but does not pay for them, the seller is entitled to recover the price. Va. Code § 8.2-703; § 8.2-709; *see also*, *Green Hill v. Greenko Corp.*, 891 F.2d 286, *1 (4th Cir. 1989) (unpublished). Azdel is entitled to the value of the 144 sheets it shipped to Zodiac, because Zodiac accepted them.

A.    Under Virginia's Adoption of the UCC, Zodiac Accepted
      Azdel's Goods.

A buyer accepts goods when it takes "any act inconsistent with the seller's ownership." Va. Code § 8.2-606(1)(c); *Moore & Moore General Contractors, Inc. v. Basepoint, Inc.*, 253 Va. 304, 308, 485 S.E.2d 131, 133 (Va. 1997) (installation

46

of cabinets constituted acceptance of the same).  "*Any* action taken by the buyer, which is inconsistent with his claim that he has rejected the goods, constitutes an acceptance." Va. Code Ann. § 8.2-606, Official Comment 4 (emphasis added).

The District Court erred because the record showed that Zodiac took multiple actions "inconsistent with" Azdel's ownership and instead demonstrated that Zodiac accepted the goods.  Va. Code § 8.2-606(1)(c).  Zodiac's Quality Control received a shipment of 144 sheets of 2000GSM Aero-Lite, *inspected the shipment without complaint*, and passed the 2000GSM Aero-Lite on to manufacturing to be formed into sidewalls.  (JA 1642-44.)  Zodiac then spent two weeks learning to use its new forming equipment with Azdel's personnel, during which time it did not complain about Azdel's visibly curved Aero-Lite sheets.  Instead, Zodiac turned the Aero-Lite into sidewalls which it presented to its customer, American Airlines.  (JA 1620-21, 1623-30.)  Zodiac took title to the Aero-Lite shipment when it formed the raw product into sidewalls.  (JA 2189, 1642-44).  These are actions inconsistent with Azdel's ownership and obligated Zodiac to pay for the product shipment.  Va. Code § 8.2-606(1).

> B.  The District Court Erred By Allowing A Purchase Order to <u>Change the Terms of the Master Agreement.</u>

Where an agreement is integrated, a court cannot look to other agreements or conversations to add to its terms.  *See, Forrest Creek Assoc., Ltd. v. McLean Sav.*

*& Loan Ass'n*, 831 F.2d 1238, 1242 (4th Cir. 1987); *Amos v. Coffey*, 228 Va. 88, 92, 320 S.E.2d 335, 337 (Va. 1984). The District Court erred in concluding that Zodiac's purchase order created several conditions precedent to acceptance. (JA 2157.)

The Master Agreement expressly rejected any terms and conditions included in purchase orders, (JA 2188, 2191), and required that changes or amendments to the Master Agreement be in writing, signed by both parties. (JA 2191.) The Agreement's integration clause also disclaimed any conversations or other understandings between the parties, other than those memorialized in the Master Agreement. (*Id.*)

The District Court attempted to bolster its reading of the Purchase Order with the assertion that Zodiac needed more time to inspect the Aero-Lite because Azdel refused to permit Zodiac to test Aero-Lite. (JA 2158-59.) But in the Master Agreement, Zodiac agreed that "the suitability of the Product for the American Airlines 757 program has been extensively tested and investigated. . . ." (JA 2189 (brackets supplied; capitalization removed)). Zodiac's plant manager testified that by the time the disputed shipment of 2000GSM Aero-Lite was made, 2000GSM Aero-Lite had already been "certified, [it] passed the static test, passed the rest of the – the tests is had to go through." (JA 843-45, 1014 (brackets supplied).) Moreover, the issue that Zodiac has complained most about – the twist in the Aero-

48

Lite sheet – was obvious to the naked eye. Zodiac inspected the shipment when it arrived and later, after forming and presenting the material to its customer, had it certified by the FAA. (JA 1642-44, 843-45, 1014.) Zodiac looked at the Aero-Lite, accepted it, and used it, but wrongly refused to pay for it. The District Court's ruling that Zodiac did not accept the sheets should be reversed, and judgment should be entered for Azdel as a matter of law.

C.    In the Alternative a Jury Should Have Weighed Whether
      Zodiac Seasonably and Properly Rejected Azdel's Shipment.

In the alternative, a jury should have been permitted to weigh whether Zodiac seasonably rejected Azdel's product. Virginia provides that notice is given when "from all the facts and circumstances known to the person at the time in question, [a person] has reason to know that it exists . . . ." Va. Code § 8.1A-202(a)(3). Whether rejection based on nonconforming goods is seasonable is a question for the jury. *Flowers Baking Co. of Lynchburg, Inc. v. R-P Packing, Inc.,* 229 Va. 370, 377, 329 S.E.2d 462, 466-67 (Va. 1985).

The Del Pinto July 2 email that the District Court termed a rejection also stated that Zodiac was "investigating a number of projects to find a more suitable application for [the 2000GSM material]" and that Zodiac would continue working with Azdel on the product. (JA 1697-98.) Azdel was entitled to have a jury weigh

the facts and circumstances as to whether this was a rejection, and whether it was seasonable.

Finally, Azdel was entitled to have a jury weigh whether Zodiac had grounds to reject the shipment. Zodiac admitted below that there was a genuine issue of material fact as to whether the 2000GSM Aero-Lite met the Specification. (Dkt. 145-1, p. 18 of 50 n.4, Dkt. 171-1, p. 5-6 of 26.) Further, a jury should have been permitted to weigh whether Zodiac's complaints about Aero-Lite were really a pretext to cover the fact that Zodiac had been working with the "wrong GSM material for over a year." (JA 843.) As it stood, the District Court erred in short-circuiting the proceedings, and by sitting as a super jury to parse conflicting expert testimony and Zodiac's credibility.

IV.    The District Court Erred By Reading the Master Agreement's Provisions In Conflict With One Another – And By Taking Facts In Best Light To Zodiac – To Conclude Zodiac Could Cancel Its Purchase Order for 2,900 Sheets of Aero-Lite.

Below, Azdel showed that its 2000GSM Aero-Lite met Specification. It also showed Zodiac was highly motivated to get out of the purchase order for 2,900 sheets of 2000GSM Aero-Lite because Zodiac had ordered the wrong weight. (JA 714, 716.) The District Court ruled that Zodiac could avoid paying for the 2000GSM Aero-Lite because it canceled the purchase order due to problems with Azdel's Aero-Lite. (JA 2159-65.) In so ruling, the District Court interpreted

50

provisions of the Master Agreement in conflict with one another and it wrongly

took evidence in best light to Zodiac.  *Pysell v. Kleck*, 263 Va. 457, 460, 559

S.E.2d 667, 679 (Va. 2002); Fed. R. Civ. P. 56.

> A.    The Specification Was the Only Standard For 2000GSM Aero-
> Lite.

 Central to the parties' dispute was whether Azdel's product met required

standards.  The Master Agreement allowed Zodiac to:

> terminate this MOU [Master Agreement] as well as any
> open orders in connection thereto if (i) *the material does
> not perform as predicted <u>and</u> is deemed not suitable for
> [Zodiac's] intended use, conversion, or process*; and
> [Zodiac] has given the required 60 days' notice and/or
> (ii) the customer requests [Zodiac] to switch base to
> conventional material/manufacturing methods.

(JA 2190 (brackets and emphasis added).)  The District Court concluded that

Azdel's products had to meet standards not contained in the Specification,

concluding that the words "performed as predicted" and the word "suitable"

incorporated another realm of expectations into the Master Agreement.  (JA 2160.)

In ruling that Azdel's material did not "perform as predicted" the District Court

noted "[p]rior to the entry of the MOU [Master Agreement] Plaintiff had predicted

. . .  many positive attributes . . ." and not all were met.  (JA 2160.)

The District Court erred because its interpretation of the purchase order is in

direct conflict with other provisions of the Master Agreement.  In particular, the

51

Master Agreement contained an integration clause that  provided that the agreement "shall supersede all previous communications, representations, or agreements, either verbal or written" (JA 2191.)  Faced with an integrated agreement a court cannot look to other agreements and representations – particularly those preceding entry of the Master Agreement.  *Forrest Creek Assoc., Ltd. v. McLean Sav. & Loan Ass'n.*, 831 F.2d 1238, 1242 (4th Cir. 1987); *Amos,* 288 Va. at 92-93, 320 S.E.2d at 337 (parties' words "sole memorial" of contract); *Wuchenich v. Shenandoah Memorial Hosp.*, 215 F.3d 1324, *10 (4th Cir. 2000)(unpublished).  Further, courts "cannot read into contracts language that will add to or take away the meaning of words already contained therein." *Pysell*, 263 Va. at 460 (citation omitted); *C.f.  Ames v. American Nat. Bank of Portsmouth*, 163 Va. 1, 39, 176 S.E. 204, 217 (Va. 1934) (when contractual provisions "seemingly conflict" they should be "harmonized"); *see also, Plunkett v. Plunkett*, 271 Va. 162, 168, 624 S.E.2d 39, 42 (Va. 2006) (same).

The District Court's reasoning renders meaningless the integration clause of the Master Agreement which expressly disclaimed prior conversations.  It also gave short shrift to the integration clause's requirement that changes to the Master Agreement be made by a signed writing.  (JA 2191.)  Indeed, the Master Agreement provided that Aero-Lite had been "extensively tested and investigated" and that Azdel warranted only compliance with the Specification.  (JA 2189-90.)

52

It attached the Specification, which is a *performance* specification. Azdel's expert, familiar with the terms and practices of the aerospace industry, explained below that the Specification was the only standard that the 2000GSM Aero-Lite was required to meet. (JA 1003.) The language of the Master Agreement makes clear that the Specification governed the standards under the Termination Provision.

The District Court's ruling thwarts the negotiated provisions of the Agreement by holding 2000GSM Aero-Lite to prior predictions where the parties agreed "previous communications" were moot. (JA 2191.) This ruling should be reversed.

> B. The District Court Erred in Resolving Factual Disputes and Making Credibility Determinations to Rule Azdel's Product <u>Deficient.</u>

The District Court further erred in finding, as a matter of fact, that Azdel did not comply with the Master Agreement. Factual disputes and credibility determinations are principally for the jury. *Anderson*, 477 U.S. at 255. Below, there was a genuine issue of material fact as to whether Azdel's product performed as predicted and was suitable.

Zodiac's complaints about Aero-Lite were not voiced until *after* Zodiac discovered its finished panel was heavier than Zodiac expected. Zodiac had "failed to weigh the 757 panel to see what weight" Zodiac needed to satisfy American Airlines. (JA 843, 1706, 1714). In Zodiac's employee's own words,

53

Zodiac had been working with the "wrong GSM material for over a year." (*Id.*) Under the Master Agreement, Zodiac was locked into its forecast and order for 2,900 sheets of 2000GSM Aero-Lite. The evidence in best light to Azdel showed that Zodiac concocted a revisionist history as a pretext to avoid paying for the 2,900 sheets of Aero-Lite. *Hardwick*, 711 F.3d at 433-34.

In fact, the record in best light showed Azdel's product met the Specification and was suitable for use by Zodiac and American Airlines. Zodiac's chief complaint was that Azdel's material was not flat. But flatness, or out-of-plane variance, was not one of the criteria contained in the Specification. (JA 1010.) The 2000GSM Aero-Lite was a "raw" material meant to be formed by Zodiac. (JA 775-77.) The lightweight highly flexible airline panel's shape and texture were to come from Zodiac's formation of the panel, which pressed the sheet into a form using heat and pressure. (JA 833-36.) The panel was, in turn, to be hung on a support structure that would cure any variations in "flatness." (JA 833-36, 1659-60.) Azdel's expert explained that the 2000GSM met specification and that Zodiac had in fact used the wrong tests to judge compliance. (JA 1007-12.)[6]

---

[6] Zodiac also did not give the required sixty day notice under the termination provision. (JA 2190.) In the event of termination, Azdel would be entitled to the value of shipments set for delivery within sixty days of the date of cancellation. (JA 2353-54.)

Zodiac's other complaints, namely that the 2000GSM Aero-Lite was supposedly brittle and showed scoring, were a result of Zodiac's manufacturing process. (JA 1012.) Zodiac was new to forming panels, and it initially did not form Azdel's sheets properly. (JA 1620-21, 1623-30, 1655-56, 1675-76, 1703-04.) Its techniques, rather than Azdel's panels, were flawed. Indeed, the challenges Zodiac raised with reference to the Aero-Lite were well known to Zodiac long before it signed the Master Agreement. As early as 2007, Zodiac tested 2000GSM Aero-Lite and documented relative brittleness and instances where Zodiac would need to add reinforcement. (JA 2334, 2337-39.) These were trade-offs for a lighter material; a jury was entitled to weigh that Zodiac was aware of these properties before it entered into the Master Agreement but did not complain until after it realized it miscalculated the weight.

### C. American Airlines Did Not Request a Return to Conventional Material.

Nor was Zodiac able to satisfy the alternative grounds under the termination provision, Section 11(C)(ii), allowing termination where a customer requests a return to conventional material. American Airlines did not request a return to conventional materials. American Airlines' personnel testified below that *Zodiac* suggested using an existing sidewall material in its planes until Azdel and Zodiac could develop a lighter nonconventional material (*i.e.*, 1320GSM Aero-Lite). (JA

55

1652-53.) Zodiac was not then entitled to terminate the Master Agreement and associated purchase orders on the theory that "the customer request[ed] [Zodiac] to switch back to conventional material/manufacturing methods," (JA 2190 (brackets supplied)), as American Airlines merely assented to Zodiac's suggestion. (JA 1652-53.) Further, such a temporary fix is not a switch back tantamount to ending the agreement. The American Airlines 757 program and Master Agreement continued as Azdel and Zodiac worked on the lighter weight 1320GSM Aero-Lite that followed 2000GSM Aero-Lite. Indeed, the Court did not find that Zodiac had terminated the Master Agreement.

> D.   The District Court Erred in Permitting Zodiac to Terminate a Purchase Order Because the Master Agreement Only Permitted Zodiac to Cancel Purchase Orders if it Canceled the Master Agreement.

Finally, the District Court misconstrued the termination provision because the Master Agreement only allowed Zodiac to cancel the purchase order if Zodiac was exiting its agreement with Azdel. Section 11(D) of the Master Agreement let Zodiac "terminate this MOU [Master Agreement] as well as any open orders in connection thereto . . . ." (JA 2190.) Canceling a purchase order was an after-effect of cancelling the agreement. This is reinforced by the next section of the Master Agreement which stated that if the agreement were terminated Zodiac was:

> responsible for any [Zodiac] raw materials, work in process, and finished goods on hand, not to exceed the

56

> dollar value of any [Zodiac] orders in Azdel's system at
> the time [Zodiac] gives 60 days' notice, unless
> termination by [Zodiac] is due to circumstances entirely
> beyond [Zodiac's] control and [Zodiac] can document
> those circumstances, subject to acceptance by Azdel.

(JA 2190 (brackets supplied, capitalization removed)).  The termination provision

and this damages provision are clean-up for where Azdel and Zodiac are not able

to operate in the aerospace industry and are exiting, thereby rendering pending

purchase orders canceled as well.  Notably, these provisions do not allow Zodiac to

simply exit without paying what it owes unless Azdel accepts that termination is

"beyond [Zodiac's] Control."  (JA 2190.)

The District Court erred as it never ruled on whether the Master Agreement

was terminated.  In fact, the record conclusively showed that Zodiac did not

terminate the Master Agreement in connection with the 2000GSM Aero-Lite.  Nor

was there an indication that Zodiac attempted to obtain Azdel's assent as to

grounds permitting a cancellation of the Master Agreement outside of Zodiac's

control.

Rather, Zodiac and Azdel went on to produce 1320GSM Aero-Lite under the

terms of the Master Agreement.  By letting Zodiac walk away from the 2000GSM

Aero-Lite purchase order when it was not walking away from the agreement,

Zodiac was able to have its cake and eat it too.

V.    The District Court Erred in Ruling That Zodiac Did Not Have to Pay for the Partial Shipment of 1320GSM Aero-Lite It Formed, Used and <u>Did Not Reject.</u>

Virginia's codification of the Uniform Commercial Code's perfect tender rule provides that a company can accept less than perfect tender, noting that a buyer's options are to "(a) reject the whole; or (b) accept the whole; or (c) accept any commercial unit or units and reject the rest."  Va. Code § 8.2-601.[7]

After Zodiac bungled the weight of panels for American Airlines, Zodiac certified and formed Azdel's new, ultra-lightweight 1320GSM Aero-Lite sheets. (JA 807-08, 957.)  Azdel delivered eight of the twenty sheets Zodiac initially ordered after learning from Zodiac that it could work with the partial shipment. (JA 808, 811, 1601.)  Zodiac not only formed the sheets into sidewall panels, but also tested them (testing which they passed) and promised to pay for them after they passed American Airlines testing.  (JA 807-08, 957, 1768.)  Notably, Zodiac never rejected the eight sheets and it never prepared any nonconforming reports as

---

[7] The District Court concluded that the number, twenty sheets, of Aero-Lite called for in Zodiac's purchase order constituted a commercial unit.  But Virginia's adoption of the Uniform Commercial Code defines commercial unit by the products' use.  A commercial unit is "a single whole for purposes of sale [the] division of which materially impairs its character or value on the market or in use." Va. Code § 8.2-105.  Zodiac's purchase order did not then define commercial unit, and the record does not support the conclusion that 20 sample sheets make up a commercial unit.

to the sheets.  Having accepted the partial performance, Zodiac was obligated to pay Azdel.

   But the District Court concluded instead that Azdel's tender of only a partial shipment was a breach, excusing Zodiac from paying.  (JA 2166.)  This is circular; a buyer cannot knowingly accept nonconforming goods and then claim breach because the goods are nonconforming.  *Moore & Moore General Contractors, Inc. v. Basepoint, Inc.*, 253 Va. 304, 308-09, 485 S.E.2d 131, 133-34 (Va. 1997); *American Furniture Co., Inc. v. Sheraton Corp.*, 854 F.2d 1316, 1316 (4th Cir. 1998) (unpublished).  It was undisputed that Zodiac formed the shipment into panels for testing and to present to American Airlines.  Azdel's performance did not "materially impair[] its character or value on the market or in use . . . ." Va. Code § 8.2-105(6)(brackets supplied).  And, regardless, Zodiac accepted the shipment knowing it was partial.  The District Court erred in again denying Azdel *anything* for its product.  Azdel is entitled to judgment as a matter of law on this claim.

   VI.   The District Court Erred in Permitting Crane to Withhold Documents
         Under a Common Interest Privilege.

Crane produced emails showing that Zodiac passed along Azdel's confidential information only after the District Court compelled Crane to make a long overdue production.  (JA 2388-89, 2397-99.)  The District Court erred in

59

permitting Crane to withhold documents because Crane failed to establish it had a joint legal strategy with a third party, but instead was attempting to shelter business communications. (JA 335, 1256.)

The common interest rule is synonymous with the joint defense privilege – "the joint defense privilege [is] more properly identified as the 'common interest rule.'" *United States v. Schwimmer*, 892 F.2d 237, 243 (2nd Cir. 1989) (citations omitted, brackets supplied) ("Only those communications made in the course of an ongoing common enterprise and intended to further the enterprise are protected."); *see also, United States v. Aramony*, 88 F.3d 1369, 1392 (4th Cir. 1996) (relying on *Schwimmer*). "The privilege arises out of a need for a common defense, as opposed merely to a common problem." *Baltimore Scrap Corp. v. David J. Joseph Co.*, 1996 WL 720785, *8 (D. Md. 1996)(citation omitted); *see also, Aramony*, 88 F.3d at 1392 (assistance responding to press inquiries that could lead to litigation not legal matter giving rise to common interest privilege).

To establish protection under the common interest rule or joint defense privilege, the proponent has the burden of (1) demonstrating that they share "common interest about a legal matter" and (2) evincing "some form of joint strategy." *In re Grand Jury Subpoena: Under Seal*, 415 F.3d 333, 341 (4th Cir. 2005); *see also United States v. Okun*, 281 Fed.App'x 228, 232 (4th Cir. 2008) (joint defense privilege does not apply where proponent fails to demonstrate

60

common interest between the parties as part of an ongoing legal enterprise or strategy). "[M]ere assertions of a common interest are insufficient to invoke the privilege." *Baltimore Scrap*, 1996 WL 720785 at *9 (citations omitted)("a party must show unanimity of legal interest").

Below, Crane failed to show that it pursued a common legal strategy with Zodiac. But the common interest privilege protects joint legal strategy, not joint business interests even where those business interests are related to a legal problem. *Aramony*, 88 F.3d at 1392. To that end, Crane's assertion that it could be a witness in an arbitration was insufficient to create a legal privilege as one does not obtain a privilege with a defendant simply by virtue of being a person with knowledge. *In Re Grand Jury Subpoena: Under Seal*, 415 F.3d at 341. Crane's explanation of its supposed common interest was conclusory and shifting – with Crane's counsel first acknowledging it lacked a common legal strategy and later attempting to clarify it meant it had no joint legal defense because no case was pending. (JA 344-45, 510.) This fails to evidence "some form of joint strategy" that is legal in nature. *In Re Grand Jury Subpoena: Under Seal*, 415 F.3d at 341; *Okun*, 281 Fed.App'x at 232. The District Court's denial of Azdel's Motion to Compel should be reversed and Crane should be ordered to disclose the documents for which it claimed a joint privilege.

## CONCLUSION

In light of the foregoing, Azdel respectfully requests that the District Court's decision be reversed, and that this Court enter judgment as a matter of law finding that Zodiac wrongly disclosed Azdel's pricing and other confidential information, that Zodiac accepted and must pay for the shipment of 144 sheets of 2000GSM Aero-Lite, that Zodiac must pay for the shipment of 1320GSM Aero-Lite, and that Zodiac is bound by its order for the 2,900 2000GSM sheets.  Azdel requests that the remaining grounds, including damages, be remanded for further proceedings.

## REQUEST FOR ORAL ARGUMENT

Appellant requests oral argument in this matter.

Respectfully submitted,

HANWHA-AZDEL, INC.,
f/k/a AZDEL, INC.


By:____/s/ Francis H. Casola_____
Of Counsel

Francis H. Casola (VSB #29108)
Frank K. Friedman (VSB #25079)
Erin B. Ashwell (VSB #79538)
Woods Rogers PLC
P. O. Box 14125
Roanoke, VA  24038-4127
Telephone:  540-983-7600
Facsimile:  540-983-7711

*Counsel for Appellant*

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(a)</u>

Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements and Type Style Requirements.

1. This brief complies with the Type-volume limitation of Fed. R. App. 32(a)(7)(B) because:

    The word count of this brief is <u>13,829 words.</u>

2. This brief complies with the typeface requirements of Fed. R. App.P32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

This brief has been prepared in a proportionally spaced typeface using:

    <u>Microsoft Word, Times New Roman, 14 point.</u>

September 26, 2014


       <u>/s/ Francis H. Casola</u>
          Of Counsel

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 26th day of September, 2014, I caused this Brief

of Appellant to be filed electronically with the Clerk of the Court using the

CM/ECF System, which will send notice of such filing to the following registered

CM/ECF users and that the sealed material will be served via First Class US Postal

Service to:

> Robert P. Silverberg
> Claire Shapiro
> Silverberg, Goldman & Bikoff, LLP
> Suite 120
> 1101 20th Street, N.W.
> Washington, DC  20007
> (202) 944-3300
> *Counsel for C&D Zodiac, Inc.*
>
> Bevin R. Alexander, Jr.
> Freeman, Dunn, Alexander, Gay, Lucy & Coates, PC
> 1045 Cottontown Road
> Lynchburg, VA  24503
> (434) 528-3400
> *Counsel for C&D Zodiac, Inc.*
>
> Jared M. Barnes
> Mark D. Cahill
> Choate Hall & Stewart LLP
> 2 International Place
> Boston, MA  02110
> (617) 248-5000
> *Counsel for Neenah Technical Materials, Inc.*

I further certify that on this 26th day of September, 2014, I caused the required copies of the Brief of Appellant to be hand filed with the Clerk of the Court.

/s/ Francis H. Casola
Counsel for Appellant