RECORD NO. 14-1654

In The

# United States Court Of Appeals

### For The Fourth Circuit

## HANWHA AZDEL, INC., f/k/a Azdel, Inc.,

*Plaintiff – Appellant,*

v.

## C&D ZODIAC, INC.,

*Defendant – Appellee,*

**and**

## NEENAH TECHNICAL MATERIALS, INC.,

*Movant – Appellee.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
AT LYNCHBURG**

_____

## NON- CONFIDENTIAL BRIEF OF APPELLEES
_____

| | | |
|---|---|---|
| Robert P. Silverberg | Bevin R. Alexander, Jr. | Mark D. Cahill |
| Claire L. Shapiro | J. Barrett Lucy | Jared M. Barnes |
| SILVERBERG, GOLDMAN | FREEMAN, DUNN, | CHOATE, HALL |
| & BIKOFF, LLP | ALEXANDER, GAY, LUCY | & STEWART LLP |
| 1101 30th Street, N.W. | & COATES, PC | 2 International Place |
| Washington, D.C. 20007 | 1045 Cottontown Road | Boston, MA 02110 |
| (202) 944-3300 | Lynchburg, VA 24503 | (617) 248-5000 |
| | (434) 528-3400 | |
| | | |
| *Counsel for Appellee* | *Counsel for Appellee* | *Counsel for Appellee* |
| *C&D Zodiac, Inc.* | *C&D Zodiac, Inc.* | *Neenah Technical Materials, Inc.* |

*Gibson*Moore Appellate Services, LLC
421 East Franklin Street ♦ Suite 230 ♦ Richmond, VA 23219
804-249-7770 ♦ www.gibsonmoore.net

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No.  14-1654        Caption:  Hanwah Azdel, Inc., etc. v. C&D Zodiac, Inc.

Pursuant to FRAP 26.1 and Local Rule 26.1,

C&D Zodiac, Inc.
(name of party/amicus)

who is _____ Appellee _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?                        ☑ YES ☐ NO
      If yes, identify all parent corporations, including grandparent and great-grandparent corporations:
       Zodiac U.S. Corporation, Zodiac Aerosafety Systems, Zodiac Seats France , Zodiac Aerospace S.A.

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                           ☐ YES ☑ NO
      If yes, identify all such owners:

- 1 -

4.    Is there any other publicly held corporation or other publicly held entity that has a direct
financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☑YES ☐NO
If yes, identify entity and nature of interest:

   Zodiac Aerospace S.A.

5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected
substantially by the outcome of the proceeding or whose claims the trade association is
pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: _____    Date: _____9 July 2014_____

Counsel for: __Appellee, C&D Zodiac, Inc.__

## CERTIFICATE OF SERVICE
****************************

I certify that on _____9 July 2014_____ the foregoing document was served on all parties or their
counsel of record through the CM/ECF system if they are registered users or, if they are not, by
serving a true and correct copy at the addresses listed below:

Robert P. Silverberg, Esq.
Claire L. Shapiro, Esq.
Silverberg, Goldman & Bikoff, L.L.P.
1101 30th Street N.W.
Suite 120
Washington, D.C. 20007

_____          _____9 July 2014_____
(signature)                                  (date)

- 2 -

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. __14-1654__    Caption: _Hanwha Azdel, Inc. v. C&D Zodiac, Inc._____

Pursuant to FRAP 26.1 and Local Rule 26.1,

_Neenah Technical Materials, Inc._____
(name of party/amicus)

_____

who is _____an appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO

2.    Does party/amicus have any parent corporations?    ☑YES ☐NO
      If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

       Neenah Filtration, LLC (Parent)
       Neenah Paper, Inc. (Grandparent)

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☑YES ☐NO
      If yes, identify all such owners:

       As the grandparent of Neenah Technical Materials, Inc., publicly held corporation Neenah
       Paper, Inc. indirectly owns more than 10% of the stock of Neenah Technical Materials, Inc.

4.      Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?        ☐ YES ☑ NO
If yes, identify entity and nature of interest:

5.      Is party a trade association? (amici curiae do not complete this question)  ☐ YES ☑ NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.      Does this case arise out of a bankruptcy proceeding?        ☐ YES ☑ NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/ Jared M. Barnes          Date:   September 18, 2014

Counsel for: Neenah Technical Materials, Inc.

## CERTIFICATE OF SERVICE
***************************

I certify that on  September 18, 2014  the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

/s/ Jared M. Barnes                          September 18, 2014
       (signature)                                 (date)

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..................................................................... iii

COUNTER-STATEMENT OF ISSUES PRESENTED FOR REVIEW .................. 1

COUNTER-STATEMENT OF THE CASE ........................................... 3

    I.     ALLEGED BREACH OF CONTRACT TO PURCHASE
          AERO-LITE SHEETS ................................................ 5

    II.    ALLEGED WRONGFUL DISCLOSURES ..................................... 14

    III.   PROCEDURAL HISTORY ................................................. 20

SUMMARY OF THE ARGUMENT ..................................................... 23

ARGUMENT ........................................................................ 25

    I.     STANDARD OF REVIEW ................................................ 25

    II.    C&D IS NOT OBLIGATED TO PAY FOR THE DELIVERED
          2000GSM AERO-LITE SHEETS ....................................... 26

        A.    C&D did not accept the Aero-lite sheets ................................. 26

        B.    The pre-production requirement did not add to or change
             the terms of the MOU ............................................. 29

        C.    The Court's ruling that C&D did not accept the 2000gsm
             Aero-lite was based upon undisputed facts ............................ 30

i

III.    C&D WAS PERMITTED BY THE MOU TO TERMINATE
        THE PURCHASE ORDER FOR 2000GSM AERO-LITE ...............33

        A.    The 2000gsm Aero-lite failed to perform as predicted and
              was unsuitable for C&D's intended use as sidewalls ..............33

        B.    American Airlines requested a return to conventional
              crushcore material ...................................................38

IV.     C&D WAS NOT OBLIGATED TO PAY FOR THE
        INCOMPLETE SHIPMENT OF 1320GSM AERO-LITE................40

V.      AZDEL DID NOT ESTABLISH DISCLOSURES OF ANY
        CONFIDENTIAL INFORMATION BY C&D .................................42

        A.    The Specification is C&D's confidential document ................43

        B.    C&D did not provide Crane with a confidential prototype
              Aero-lite sidewall ...................................................45

        C.    C&D did not disclose Azdel's confidential pricing
              information ............................................................48

VI.     AZDEL IS NOT ENTITLED TO RELIEF ABSENT A
        SHOWING OF CAUSATION OF HARM........................................49

VII.    THE DISTRICT COURT DID NOT ABUSE ITS
        DISCRETION WHEN IT CORRECTLY HELD THAT THE
        COMMON INTEREST DOCUMENTS ARE PRIVILEGED
        AND SHOULD NOT BE PRODUCED .............................................56

VIII.   AZDEL'S MOTION FOR PARTIAL SUMMARY
        JUDGMENT WAS PROPERLY DENIED .......................................61

CONCLUSION ...............................................................................61

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

# TABLE OF AUTHORITIES

Page(s)

Cases:

*Aguilera v. Pirelli Armstrong Tire Corp.*,
 223 F.3d 1010 (9th Cir. 2000) ....................................................................52

*Ajaxo Inc. v. E\*Trade Group Inc.*,
 135 Ca. App. 4th 21 (2005)........................................................51, 52, 53

*American Chlorophyll, Inc. v. Schertz*,
 176 Va. 362, 11 S.E.2d 625 (S. Ct. Va. 1940) .............................................41

*Anderson v. Liberty Lobby, Inc.*,
 477 U.S. 242 (1986).........................................................................26, 61

*Bentley Funding Group v. SK&R Group, LLC*,
 269 Va. 315, 609 S.E.2d 49 (2005) ...............................................................44

*Black v. Richfield Oil Corp.*,
 41 F. Supp. 988 (S.D. Cal. 1941) ..................................................................44

*CDF Firefighters v. Maldonado*,
 158 Cal. App. 4th 1226, 70 Cal. Rptr.3d 667 (2008) .....................................51

*Charlotte Union Bus Station, Inc. v. Internal Revenue*,
 209 F.2d 586 (4th Cir. 1954) ........................................................................44

*Daniels v. McPhail*,
 93 Cal. App. 2d 479; 209 P.2d 19 (Ct. App. 1949)......................................42

*Emmett v. Johnson*,
 532 F.3d 291(4th Cir. 2008) .........................................................................26

*Filak v. George*,
 267 Va. 612, 594 S.E.2d 610 (Va. 2004) ......................................................51

*Flextronics Int'l, Ltd. v. Parametric Tech., Corp.*,
 2013 U.S. Dist. LEXIS 133403 (N.D. Cal. 2013).........................................54

*Forest Hills Early Learning Ctr., Inc. v. Lukhard,*
    728 F.2d 230 (4th Cir. 1984)...................................................................61

*Foster Poultry Farms v. Suntrust Bank,*
    377 Fed. Appx. 665 (9th Cir. 2010) ................................................51, 52, 53

*Gardner v. RSM&A Foreclosure Servs, LLC,*
    2013 U.S. Dist. LEXIS 89303 (E.D. Cal. 2013) .........................................51

*Hunton & Williams v. U.S. Dept. of Justice,*
    590 F.3d 272 (4th Cir. 2010) .......................................................................57

*In re Grand Jury Subpoenas,*
    902 F.2d 244 (4th Cir. 1990) ...........................................................57, 58, 60

*In re Under Seal,*
    749 F.3d 276 (4th Cir. 2014) .......................................................................29

*J. David Conti, Inc. v. Stokes Equip. Co., Inc.,*
    1995 U.S. App. LEXIS 36350 (4th Cir. 1995)..............................................41

*La Jolla Cove Investors, Inc. v. Goconnect Ltd.,*
    2012 U.S. Dist. LEXIS 62948 (S.D. Cal. 2012)...........................................54

*Martin v. NAES Corp.,*
    2013 U.S. Dist. LEXIS 20361 (W.D. Va. 2012) ..........................................51

*Murphy v. DirecTV, Inc.,*
    724 F.3d 1218 (9th Cir. 2013) .....................................................................44

*Muth v. United States,*
    1 F.3d 246 (4th Cir. 1993) ...........................................................................29

*Oracle Corp. v. SAP AG,*
    734 F. Supp. 956 (N.D. Cal. 2010)...............................................................53

*Patent Scaffolding Co. v. William Simpson Constr. Co.,*
    256 Cal. App. 2d 506, 64 Cal. Rptr. 187 (1967) .........................................52

*Rosenbaum Hardware Co. v. Paxton Lumber Co.,*
    124 Va. 346, 97 S.E. 784 (1919) .................................................................28

*Rowland v. American General Finance*,
340 F.3d 187 (4th Cir. 2003) ...........................................................26, 55, 57

*Ruiz v. Gap, Inc.*,
380 Fed. Appx. 689 (9th Cir. 2010) .................................................52

*Sagar v Oracle Corp.*,
523 Fed. Appx. 999 (4th Cir. 2013) .................................................26, 55, 57

*SL Montevideo Tech., Inc. v. Eaton Aerospace, LLC*,
491 F.3d 350 (8th Cir. 2007) ...........................................................49

*Smith Barney Inc. v. Critical Health Syst. of N.C.*,
212 F.3d 858 (4th Cir. 2000) ...........................................................44

*Sperry Rand Corp. v. A-T-O, Inc.*,
447 F.2d 1387 (4th Cir. 1971) .........................................................53

*SunTrust Bank v. Farrar*,
227 Va. 546, 675 S.E.2d 187 (S. Ct. Va. 2009) ............................51

*Tattoo Art, Inc. v. TAT Int'l*,
794 F. Supp. 2d 634 (E.D. Va 2011) ..............................................51

*Troyk v. Farmers Group, Inc.*,
171 Cal. App. 4th 1305, 90 Cal. Rptr.3d 589 (2009) ....................51

*Twin Lakes Mfg., Co. v. Coffey*,
222 Va. 467 (1982) ..........................................................................29

*United States ex rel. Becker v. Westinghouse Savannah River Co.*,
305 F.3d 284 (4th Cir. 2002) ...........................................................26, 55, 57

*United States v. Am. Target Adver., Inc.*,
257 F.3d 348 (4th Cir. 2001) ...........................................................29

*United States v. Okun*,
281 Fed. Appx. 228 (4th Cir. 2008) ................................................58, 60

Statutes:

Cal. Civ. Code § 3300 ..................................................................................51

Cal. Civ. Code § 3509-3548 ........................................................................42

Va. U.C.C. § 8.2-105 ...................................................................................41

Va. U.C.C. § 8.2-106(3)&(4) .......................................................................35

Va. U.C.C. § 8.2-513(1) ...............................................................................28

Va. U.C.C. § 8.2-513(4) ...............................................................................28

Va. U.C.C. § 8.2-601 .........................................................................40, 41, 42

Va. U.C.C. § 8.2-606(1)(a) ..........................................................................28

Va. U.C.C. § 8.2-606(1)(c) ..........................................................................27

Va. U.C.C. § 8.2-606, Official Comment 4 ................................................28

Rules:

Fed. R. App. P. 38 ........................................................................................56

Fed. R. Civ. P. 56 ........................................................................................61

Fed. R. Civ. P. 56(a) ....................................................................................25

## COUNTER-STATEMENT OF ISSUES PRESENTED FOR REVIEW

Appellant Hanwha-Azdel, Inc. ("Azdel") challenges both the District Court's adverse rulings on discovery matters and the Court's summary judgment decision in favor of C&D Zodiac, Inc. ("C&D") repeating the objectionable behavior the District Court found in its summary judgment briefs below, namely:

> Plaintiff attempts to create the appearance of material factual disputes by mis-characterizing testimony, building inferences upon each other, or drawing unwarranted conclusions from isolated excerpts of testimony, devoting 17 pages of its opposition to Defendant's motion to the recitations of allegedly disputed facts. However...these alleged factual disputes lie on the periphery of the case and do not create any "genuine" dispute with respect to any "material" fact.

JA 2155. Azdel's Statement of Issues Presented for Review is infected with the same maladies. Correcting for Azdel's errors, C&D sets forth its Counter-Statement of Issues Presented for Review:

I.    Did the District Court err in granting C&D summary judgment on Count I because C&D did not accept Azdel's 2000 grams per square meter ("gsm") Aero-Lite sheets when it kept the delivered, warped Aero-lite sheets that were pre-production samples that had to be molded, tested, and presented to American Airlines before C&D could determine whether to accept them.

II.   Did the District Court err in granting C&D summary judgment on Counts I and II when C&D terminated its Purchase Order pursuant to Section 11.C of the Memorandum of Understanding ("MOU") after notifying Azdel that the material did not perform as predicted and was not suitable for C&D's intended use as interior aircraft sidewalls for American Airlines B757 aircraft, or because American Airlines requested C&D to switch back to conventional crushcore manufactured sidewalls.

III. Did the District Court err in granting C&D summary judgment on Count III when Azdel was not able to manufacture and deliver a unitary lot of 20 sheets of 1320gsm Aero-lite to C&D, and refused to cure the default.

IV. Did the District Court err in granting C&D summary judgment on Counts IV and V when the material undisputed facts showed that C&D did not provide third-party Crane and Co., Inc. ("Crane")[1] with Azdel's information protected by either the confidentiality clause of the MOU or the Confidentiality and Non-Disclosure Agreement ("NDA").

V. Even assuming wrongful disclosures of Azdel's confidential information, did the District Court err in granting C&D summary judgment on Counts IV and V because Azdel did not prove causation, an essential element of breach of contract under California law.

VI. Did the District Court abuse its discretion and act prematurely in bifurcating Azdel's discovery into damages available for the alleged breach of the confidentiality provisions of the MOU and NDA and then granting summary judgment on Counts IV and V alleging breaches of confidentiality.

VII. Did the District Court abuse its discretion in permitting non-party Crane to withhold or redact 30 documents based on Crane's assertion of a common interest privilege with a non-party, where the disputed documents were in furtherance of a common legal interest.

VIII. Did the District Court abuse its discretion in denying Azdel's motion for partial summary judgment based on the undisputed material facts.

---

[1] After the District Court granted summary judgment in favor of C&D, the equity in the Crane subsidiary operating the relevant business unit in this appeal was acquired by Neenah Paper, Inc., which subsequently changed the name of the relevant business unit to Neenah Technical Materials, Inc. Thus, while Movant-Appellee in this appeal is Neenah Technical Materials, Inc., it is referred to herein as "Crane", its name in the Complaint, all filings below, and the Court's Opinion.

## COUNTER-STATEMENT OF THE CASE

Azdel devotes 25 pages of its brief to a Statement of the Case ("Statement") that, in addition to many errors, complicates the facts by jumbling the chronology of events. Azdel begins its Statement with a discussion of disclosures of its allegedly confidential information that happened between one and a half and two and a half years after the parties entered the MOU documenting C&D's agreement to purchase from Azdel 2000gsm Aero-lite sheets that was intended for molding by C&D into interior sidewalls for the refurbishment of American Airlines' B757 aircraft. Further, Azdel's Statement continues the pattern of misleading advocacy found by Judge Moon to exist, by omitting or minimizing many material undisputed facts that led the District Court to grant summary judgment in C&D's favor on all counts of the Complaint. These key facts are as follows:

- C&D and Azdel contracted for Azdel to produce sheets made of 2000gsm Aero-lite material that would be molded by C&D into aircraft sidewalls for American Airlines' B757 refurbishment program.

- Azdel agreed that C&D would have the right to terminate the MOU as well as open purchase orders upon 60 days prior notice if the material did not perform as predicted and was not suitable for C&D's intended use.

- Azdel agreed that C&D would have the right to terminate the MOU as well as open purchase orders if C&D's customer, American Airlines, rejected the Aero-lite sidewalls in favor of conventional sidewalls.

- C&D's forecast and purchase order for 2,900 sheets of 2000gsm Aero-lite called for an initial June 2008 delivery of 40 "pre-production" sheets, sheets Azdel knew C&D would attempt to mold, test, and present to American Airlines for approval.

3

- Azdel manufactured 2,393 sheets in April/May 2008, before it knew whether the pre-production sheets were suitable for C&D's use as sidewalls or acceptable to American Airlines.

- The Aero-lite sheets initially delivered to C&D were warped, and when molded produced warped sidewalls that were brittle and heavier than the conventional crushcore panels.

- After a fit check at American Airlines' facility, American expressed concerns over numerous problems with the Aero-lite panels.

- C&D promptly advised Azdel in writing that the 2000gsm Aero-lite "definitely can not be used for sidewall production."

- American Airlines never signed C&D's Change Request proposing the use of Aero-lite on its aircraft, leaving C&D no choice but to switch back to sidewalls made from the conventional crushcore product.

- C&D's later order for a lot of 20 sheets of lighter weight 1320gsm Aero-lite was not fulfilled by Azdel even after C&D gave Azdel an opportunity to cure its incomplete 8-sheet partial delivery.

- C&D was not restricted under its agreements with Azdel from working with an alternative supplier; it did not grant Azdel exclusivity.

- The NDA required an item or document to be "conspicuously labeled" confidential to be protected from disclosure.

- C&D did not provide any document or item labeled confidential by Azdel to Crane.

- Azdel has not even attempted to prove any lost profits that resulted from C&D's alleged disclosures of information.

A more complete and chronological Statement of the Case, supported by record citations, is set forth below.

4

I.    ALLEGED BREACH OF CONTRACT TO PURCHASE AERO-LITE
      SHEETS

Azdel created a composite sheet product, called Aero-lite, that it claimed
could be formed into aircraft interior sidewalls that had several benefits over the
conventional crushcore sheets that had for many years been manufactured and used
by C&D for this purpose.  The touted benefits included a lighter product that was
easier to mold with better durability and maintainability.  JA 740, 1998, 2528.
Over several years, Azdel experimented with several different weight products
ranging from 1500 to 2000gsm.  In March of 2007, C&D drafted a Specification
(CDM005-05) that set out performance parameters for Aero-lite and similar
products,[2] and marked the Specification as proprietary.  JA 2198-2208.  Although
the draft Specification was lightly edited to accommodate Azdel's concerns about
limitations of the Aero-lite product, the Specification was "fairly generic" and
applied broadly to "processed materials made with CDM005-01 Type 7
Polyetherimide (PEI) resin and glass fibers produced in a pulping and sheet
process for use with Civil Aircraft".  JA 2033-2035, 2201 ¶2.1.  PEI resin is a
thermoplastic material manufactured by SABIC (previously GE Plastics), a third-

---

[2] Azdel prohibited C&D from testing the chemical properties of its product, which
might have revealed Azdel's proprietary data, requiring C&D to draft the
Specification to include only performance criteria.  JA 553-554, 593-594,1371-
1372, 2201¶2.1.

party that sold Ultem PEI resin to Azdel for use in Aero-lite and helped manage

and worked closely with Azdel throughout the development of Aero-lite. JA 654,

2527-2534.

Notwithstanding the purported benefits of Aero-lite, it had certain inherent

drawbacks. Aero-lite sheets required stiffeners to address brittleness that could not

be manufactured out of the material, experienced tears in the scrim backing

stiffening the product, and varied in thickness. JA 659, 663-664, 667, 689-690,

2263. Based upon these considerations, C&D and Azdel jointly agreed in the

MOU to specify use of the 2000gsm product for the American Airlines B-757

refurbishment project, which was one of several weights previously shown to

American and, according to Azdel witnesses, was 400 gsm lighter than the

established benchmark.[3] JA 1222, 657, 661, 669-670, 2268-2269, 2328-2339.

To memorialize the mutual decision to use 2000gsm Aero-lite for the

American Airlines project (JA 2185 ¶4.1), on March 12, 2008, the parties entered

into the MOU, "the foundation for establishing a formal contract to be developed

---

[3] While Azdel emphasizes that Danny Martin, the manager of the C&D molding
facility, believed C&D purchased the wrong weight material, his facility gets
involved after C&D decides what product is needed; C&D's engineering
department chooses the product to use. JA 627, 650. Thus, Mr. Martin was not
involved with Aero-lite until long after the parties mutually agreed to use 2000gsm
material for the American Airlines project. Accordingly, his subjective comments,
made months after a 2000gsm sidewall was tested at an American Airlines fit
check" (JA 1706), does not create any genuine issue of material fact about the
merits of the parties' mutual decision to agree to a 2000gsm weight at the time it
was made.

over the next 60 days" that was "self-terminating if not extended by the terms stated herein", which it was not.  JA 2184 Whereas Clause (E); JA 2190 ¶11.B, *see also* JA 666-667.  In an attempt to conceal the preliminary status of the MOU, it is inaccurately elevated in Azdel's brief into a "Master Agreement", something it has never before been called.

Although the Aero-lite product had been manufactured previously in small sample quantities, and some of those sheets had been molded into parts by SABIC, Aero-lite had never before been made in commercial quantities.  Because of Aero-lite's newness, the MOU relieved Azdel of the common seller obligation to warrant its product for C&D's particular purpose.  JA 2189-2190 ¶9.  However, even though samples had been tested and investigated by the parties, the MOU expressly allowed C&D to terminate the agreement and any open orders:

> . . .if (i) the material does not perform as predicted and is deemed not suitable for C&D's intended use, conversion or processing, and C&D has given the required 60 days' notice and/or (ii) the customer requests C&D to switch back to conventional material/manufacturing methods.

JA 2190 ¶11.C.  This termination right in favor of C&D was in addition to the right of either party to cancel the MOU without liability in the event of a material breach of the agreement.  JA 2190 ¶11.A.

Pursuant to other terms of the MOU, C&D issued a forecast for 2,900 sheets of the 2000gsm Aero-lite, with deliveries staggered over 8 months, then issued a

purchase order ("PO") reflecting the same. JA 2189 ¶7.B; 2350-2352, 2480. The material fact ignored by Azdel is that the forecast and relevant PO both identified the initial 40-sheet delivery, scheduled for June 11, 2008, as "pre-production." *Id.*, JA 542, 647. This qualifier was included because, as acknowledged by Chris Willis, Azdel's project manager for Aero-lite, C&D could not determine whether to accept the delivered sheets until after it molded some into aircraft sidewall panels, performed initial tests, and presented a sample sidewall to American Airlines for acceptance. JA 646-647, 672, 680. Notwithstanding this requirement, Azdel jumped the gun and manufactured nearly 90 percent of the order before the initial 40 "pre-production" sheets had been delivered to C&D, thereby accepting the risk that C&D would not accept the product. JA 147 (all but 363 sheets manufactured).

Also brushed aside by Azdel is the fact that the sheets delivered by Azdel in June of 2008 (40 pre-production plus 110 scheduled for July delivery) were undeniably warped, and that the warpage existed at both the initial and consolidation stages of manufacture. JA 2499-2507, 2508-2518. The precise extent of warpage is intentionally underplayed by Azdel as being "not perfectly flat and had a twist" (Appellant's Brief, p.17, herein "Ap. Brief" ), although Azdel's outside expert described it has having "an extreme 'saddle' type curl" (JA 2515), and others described it as "severely twisted" (JA 1706). However described,

diagonal corners of each sheet were curled up 5-6 inches. JA 884.  Thus, it is absolutely undisputed that the product described by Azdel in its Production Part Approval Process form as a "flat sheet", was clearly and visibly not flat.  JA 1338-1339.  This was a striking contrast to the flat 2000gsm sample sheets manufactured by Azdel in 2006.  JA 565, 2263.

Another fact Azdel simply ignores when focusing on C&D's retention of the warped sheets is the undisputed testimony that C&D's Quality Department kept the sheets because it understood correctly that they were pre-production samples, outside of production requirements. JA 2023-2024.  C&D attempted to mold the pre-production sheets, using the settings and techniques demonstrated by Azdel and SABIC personnel, because it hoped that application of heat and pressure during molding would remove the warpage or that warpage would not be a problem after installation. JA 639-640, 884, 1620-1621, 1637, 1706, 2554.  Also contrary to Azdel's claim that C&D "inspected the shipment without complaint" (Ap. Brief, p.47), C&D promptly notified Azdel of the warped condition of the delivered sheets, which prompted Azdel's Mr. Willis to visit C&D's manufacturing facility shortly after delivery.  JA 643, 682-685.

Azdel contends, unsupported by the record, that the sidewalls "were still effective" for C&D's use as sidewalls, and implies that C&D's inexperience led to

9

the retained warpage. Ap. Brief, pp. 17-19.[4] However, Azdel omits the material fact that a team of Azdel and SABIC representatives visited C&D's facility at the end of June 2008, after the American Airlines' fit check, to see if they could help C&D modify the forming process in a way that would allow warped 2000gsm sheets to be molded into useable sidewall panels. JA 518, 1114-1119, 2519-2520. These efforts failed, leading the Azdel employee supervising those efforts to conclude that "warped sheets mold into warped parts." JA 1114, *see also* 518-531.

As noted by Azdel, C&D nevertheless took a sample sidewall to American for a fit check in late June of 2008, hoping that the warpage would be removed upon installation in the aircraft. JA 884. However, numerous problems discussed during the installation with Jay Zoller, American's Lead Interiors Engineer for this project, evidenced concerns on American's part and revealed that the Aero-lite sidewall did not meet American's expectations. JA 557, 560-561, 640-641, 718-722, 729-730, 742-748. Although the 2000gsm product was lighter than the benchmark, the sidewall overall was heavier than the comparable crushcore panel. JA 725. Notwithstanding Azdel's contention that weight is everything (Ap. Brief, pp.6, 19), Mr. Zoller identified several other factors, including maintainability, aesthetics, reliability, and function, that also play a role in determining whether a

---

[4] Section 11.C of the MOU provides that C&D alone evaluates the material's performance and suitability for C&D's intended use: Azdel plays no role under Section 11.C in that determination.

10

product is acceptable.  JA 734, 2055, 2057.  He also expressed concern about the sidewalls' ability to hold up given the "residual stress" applied because of the warp, even if it looked good upon installation.  JA 639-640, 733, 884.  Finally, he noted that the panel "broke", specifically that it "cracked" around the window reveal, during installation.  JA 718, 722.  Thus, Azdel's repeated claim that C&D's weight error was the real reason for American's rejection of Aero-lite, and that complaints about warpage were simply a pretext to hide the error, is a figment of Azdel's imagination unsupported by the record evidence. The fact that the sidewall made of 2000gsm Aero-lite was heavier than American would ideally have liked does not alter the undisputed facts that Azdel agreed in signing the MOU to use that weight material, that C&D notified Azdel of the warpage problem well before the fit check, and that American determined for multiple reasons that it would not use this heavier warped product on its B757 aircraft.

Azdel also contends that Section 11.C.(ii) of the MOU is not triggered because the decision to switch to conventional crushcore was made by C&D, not American, which "merely assented to Zodiac's [C&D's] suggestion".  Ap. Brief, pp.55-56. In fact, Mr. Zoller also testified that American was involved in the process and made the "ultimate decision" regarding the products that go on their aircraft.  JA 718, 736.

11

C&D promptly advised Azdel by telephone of American's concerns and followed up with a July 2, 2008 letter to Mr. Willis advising him in detail of the problems with the Aero-lite material and concluding that the 2000gsm sheets "definitely can not be used for sidewall production." JA 643, 883-887; *see also* JA 2317 (telephone advice that material not formable in current state). In short, C&D clearly informed Azdel that the 2000gsm Aero-lite sheets could not be used for their intended purpose, it did so more than 60 days before the next scheduled October 1, 2008 delivery, and Mr. Willis at Azdel understood that C&D no longer wanted the 2000gsm product for the American refurbishment program. JA 692, 699, 2317. Accordingly, even if the MOU was still in effect after the failed fit check notwithstanding the self-termination provision, it was clearly terminated as of July 2, 2008.

Equally important, even though C&D shortly after the fit check sent a contract Change Request to American suggesting that existing Aero-lite sidewalls be used in place of the conventional crushcore product until a lighter weight Aero-lite was developed, the contract amendment was never signed by American. JA 750-755, 2317. This effectively left C&D no choice but to switch back to the conventional crushcore product, which it did for the next 17 aircraft. JA 617.

In mid-September 2008, only two weeks before the scheduled October delivery, Azdel informed C&D that a written document formally indicating the

disposition of the order was needed. C&D immediately issued a revised PO zeroing out all installments with a "0.00" notation. JA 694, 697-699, 1476-1481, 2353-2354. Azdel signed off on this PO without any comment about the change in quantity. JA 2354.

After the rejection of the 2000gsm product, hoping still to get Aero-lite sidewalls onto American's aircraft, Azdel manufactured some lighter weight Aero-lite, and C&D molded and tested several of these iterations. JA 629-630, 2369-2371 (1250, 1350,1320 gsm sheets). The final product ordered was 20 sample sheets of 1320gsm Aero-lite. JA 2369. The undisputed record evidence shows that these 20 sheets were to be provided at an agreed per lot price of $15,000, with additional sheets provided at no additional charge. JA 2361, 2369. Although more than 50 sheets were manufactured, Azdel found only 8 sheets it believed were conforming, then delivered and billed C&D $6,000 for those sheets on a per sheet basis in August of 2009. JA 701-702, 704-707, 1482-1488, 2260. When C&D's Mr. Martin asked whether Azdel would produce more of the 1320gsm sheets, Azdel refused. JA 696, 709-710. Although C&D could do initial product testing with the 8 sheets, this was not sufficient to allow it to complete the full product qualification process. JA 629-630, 701. Further, when C&D asked Azdel more than a year later, in September 2010, whether it could provide 20 sheets for a comparative analysis, Azdel said no due to lead time issues, plus lack of plans to

13

produce Aero-lite in 2010.  JA 2551; *see also* 2561 (CEO confirms lack of

anticipated sales in 2010).

II.    <u>ALLEGED WRONGFUL DISCLOSURES</u>

        During the course of discovery Azdel twice amended the Complaint to

include Counts IV and V, the causes of action involving alleged disclosures of

Azdel's confidential information to Crane in violation of the confidentiality

provision of the MOU and the separate NDA entered by the parties the same day

(March 12, 2008), that have now become Azdel's primary focus on appeal.

        When the parties entered the MOU, they included a Confidentiality

provision protecting "This MOU and any subsequent PO's" from disclosure.  JA

2191 ¶12.  This provision also referenced Attachment A to the MOU, the NDA

executed the same day (JA 2194-2196), which identified information that might be

deemed "Confidential Information" but only if it was "conspicuously labeled"  by

the disclosing party as "Confidential."  JA 2194 Whereas (C) & ¶2; *see also* JA

608-609.  Azdel conceded that unless a document or other item was marked

Confidential it was not entitled to confidential treatment under the NDA. JA 608-

609.

        By eliminating any dates from the portion of the Azdel Statement dealing

with C&D's alleged disclosures to Crane, Azdel attempts to paint a picture of

C&D engaging in secret conversations with and giving Azdel's confidential

information to Crane, while leading on Azdel about its intent to use Aero-lite.  Ap.

Brief, pp.24-27.  The actual timeline presents an entirely different picture.  C&D

did not even communicate with Crane until October 30, 2009, nearly sixteen

months after Azdel provided C&D with the warped 2000gsm Aero-lite in June

2008 and nearly three months after Azdel refused to complete the order for 20

sheets of 1320gsm Aero-lite in August 2009.  JA 569-570, 1099-1100, 2470-2472.

Second, C&D contacted Crane only at the urging of SABIC, after SABIC advised

C&D that Azdel had pulled out of the Aero-lite market and indicated that Crane

might be able to make a similar lighter weight sheet product, where Azdel had

failed.  JA 569-576, 584-585.  Since C&D had not given Azdel exclusivity under

the MOU, it followed up on SABIC's suggestion.[5]  JA 1984-1985, 2184-2185.

Third, even later, in September 2010, C&D asked Azdel to provide 20 sheets of the

lightweight product for a final comparative analysis of the various sidewall

products (Azdel's Aero-lite, Crane's Composite Aerospace Board ("CAB"), and

C&D's crushcore).  JA 2551-2552.  Azdel said it was unable to provide the

requested sheets at that time and did not offer to provide them later in 2010.  *Id.*

---

[5] Nor was Azdel precluded from selling Aero-lite by the MOU's Exclusivity
provision. JA 2185 ¶ 3. Azdel's third-party marketing efforts were only limited
with respect to programs listed in Section 3 of the MOU and, even then, Azdel had
the right to continue to supply those programs if C&D's contracts were terminated.
JA 2185 ¶ 2.

15

Equally important, Azdel's descriptions of the information provided to Crane clearly mischaracterize the facts. Azdel complains that C&D provided Crane with the Specification attached to the MOU. While C&D admits that a slightly modified version of the Specification was provided to Crane, the material fact is that the Specification was clearly labeled as C&D's proprietary document. JA 2199-2208. Azdel did not ask that it be labeled as its confidential document. Moreover, although it was attached as an exhibit to the MOU, it was a separate document, dated a year before the MOU was executed and prepared for signature by C&D only. JA 2198.

Further, as discussed above (p.5), the Specification was generic and established performance requirements for products made with PEI resin and glass pulp for use in civil aircraft. The Specification did not contain any confidential information about the Aero-lite formula or manufacturing process, nor could it, because C&D was not privy to such information (*see* fn.2 above). Consequently, although Crane produced its Composite Aerospace Board ("CAB") sheet product made with PEI resin and glass fibers in a pulping and sheet process that met the performance requirements of the C&D Specification, it did not obtain any confidential information about Aero-lite from the Specification. JA 593-594, 2201 ¶2.1. Further, CAB was far different than Aero-lite. Azdel used SABIC's Ultem resin pellets ground into a sintered powder and sprinkled them onto a vibrating

16

conveyor belt with the glass fibers: Crane used an Ultem resin fiber product that SABIC had introduced them to several years earlier, that was chopped up into pieces the same size as the glass fibers, then combined the resin and glass in a process similar to that used by Crane for decades in paper-making on Crane's proprietary "homegrown" one-of-a-kind equipment for making wet-laid nonwoven materials. JA 594-597, 1215-1217, 2456, 2466-2468. The result was a better looking and performing product that met with American's approval.

Second, Azdel contends that C&D allowed Crane to mold a sidewall from a confidential non-commercial sheet of 1320gsm Aero-lite during molding trials on CAB and gave Crane this prototype to use in its own product development. As a preliminary matter, these molding trials were at the end of March 2010 when Crane was demonstrating the molding ability of the CAB sheet, after development was essentially completed.[6] JA 2474-2475 (early development underway August 2009); 578 (handsheet available, December 2009); JA 1023-1036 (March 2010 Report).

Azdel cites to a March 28, 2010 Report of the CAB molding trials as evidence that the Aero-lite control sidewall was made from its 1320gsm product. JA 1023-1036. However, the cited Report does not mention the 1320gsm product: it refers only to "1350 GSM" Aero-lite. JA 1026. This is a separate product

---

[6] Azdel has never claimed that Crane breached any Aero-lite patent or violated any of Azdel's trade secrets in connection with Crane's development of CAB.

ordered by C&D on October 1, 2008, more than six months before the 1320gsm product was ordered, that C&D paid $30,000 for pursuant to PO 2-1029-3 and that lacked confidential status under the NDA. JA 1026, 2370-2371. Additionally, Crane's witness who authored the Report testified that he did not at the time of his deposition remember the weight of the Aero-lite control sheet, but did recall unequivocally that it was a commercially-available product. JA 1902-1903.

Third, Azdel alleges disclosure by C&D to Crane of Azdel's confidential pricing information. Specifically, Azdel refers here to a pricing chart that Mr. Martin at C&D provided to SABIC, that SABIC forwarded on to Crane. JA 2397-2399. Azdel does not allege and there is no evidence suggesting that the confidential letters containing price quotes from Azdel to C&D were shown to Crane or SABIC; it contends only that certain price and volume discount-related numbers contained in those letters made their way into the C&D pricing chart. Azdel, however, intentionally minimizes the fact that the chart varied in significant respects from Azdel's actual historic pricing as set forth in its quotes and invoices to C&D. While certain prices set out in the chart were the same as those in the referenced Azdel price quotes, others were quite different. *Compare* JA 2399 *with* JA 2363, 2367 (chart price for ▮ sheets of 1300gsm Aero-lite is ▮ per square foot as compared to ▮ in Azdel's price quote letter; chart price for ▮ sheets of 1200gsm Aero-lite is ▮ per square foot as compared to ▮ in Azdel's

18

letter).  Further, the quantity price breaks in the price chart are different than those offered by Azdel in its April 30 "finalized pricing" quote, which is cited to but intentionally not discussed or displayed in Azdel's brief.  Ap. Brief, p. 34 (cite says "see also, 2365"); *compare* 2399 *with* JA 2365 (categories are ██████████ sheets, as compared to ████████████ sheets).  Finally, the ████████ sheet price shown in the price chart for the 2000gsm is far less than the agreed ████████ per sheet price in C&D's PO that Azdel actually billed for the Aero-lite sheets.  *See* JA 2350-2352, 2356.

Azdel initially argued below that the pricing in the chart "correlates exactly and is identical to Azdel's confidential pricing. . ."  JA 2171-2172.  When C&D proved that Azdel deliberately used isolated excerpts from the pricing letters as well as the chart to create this false impression, it then argued that the variations were "irrelevant" and made "no difference."  JA 2172.  While Azdel is more forthcoming in its appellate brief, showing some of the hidden differences, it has still omitted and ignored other differences, arguing that what it now calls "hiding it among other data" does not make confidential disclosures less wrong.  Ap. Brief, p.35.  As the Court below recognized, the variations do indeed make a "substantial difference."  JA 2172. They demonstrate that C&D was simply using past pricing loosely as a guide to let Crane know what C&D was willing to pay for Crane's new, and as yet, unpriced product.

19

Even assuming that any wrongful disclosures were made, Azdel has not incurred and is not seeking damages in the form of economic loss to Azdel caused by the disclosures. JA 185 fn.1, 186. It is instead seeking disgorgement of all profits made by C&D on sales involving the CAB product. JA 99, Dkt. No. 75 pp.9, 11. It is also seeking its entire development costs for the Aero-lite product, even though it is still capable of manufacturing Aero-lite and lists Aero-lite as a product for sale on its website. Dkt. No. 75 p.11; JA 147-148, 612-613, www.azdel.com/lwrt.htm. Moreover, this is in addition to the full amount due for the 2,900 ordered 2000gsm Aero-lite sheets plus the 8 delivered 1320gsm Aero-lite sheets. JA 147-148. Thus, Azdel is seeking in excess of $1.8 million plus C&D's profits attributable to sales of products made using CAB notwithstanding its failure to produce a viable thermoplastic sheet product that could be used by C&D for aircraft sidewalls.

## III.    PROCEDURAL HISTORY

After amending the Complaint to include the breach of confidentiality claims, Azdel served extensive discovery into those claims. Azdel supplemented its original discovery with 50 additional document requests focused primarily on these two new causes of action. Dkt. No., 46-2 (Ex.B to Plaintiff's Second Motion to Compel). C&D's responses to those document requests included over 600 pages of hardcopy documents and more than 15,000 pages of electronic discovery,

20

comprising virtually all communications between C&D and Crane that pertained to CAB or Aero-lite. JA 53. Azdel also took 10 depositions of C&D personnel, six individual and four 30(b)(6) depositions, that included questioning regarding C&D's relationship with Crane.

Azdel also served a third set of document requests on C&D that delved deeply into C&D's financial operations allegedly in order to obtain the information needed to calculate amounts owed under Azdel's newly-added forms of relief. JA 64-83. Most of the requests pertained to CAB-related financial information, while others sought documents detailing C&D and its parents' general financial position.[7] It is only this highly intrusive discovery into C&D's sensitive financial information that the Court delayed until after Azdel proved C&D's liability for breach of the NDA, when it granted C&D's Motion to Bifurcate. JA 184-190.

---

[7] The new interrogatories requested C&D's actual and projected sales revenue, actual and expected gross margin, net margin, gross profit, and net profit, and how such amounts were calculated, for any programs using any product incorporating CAB. JA 70-71. The 16 new document requests (JA 80-83) sought documents pertaining to "all actual and projected sales of CAB or any product incorporating CAB, such as Ecoform"; "C&D's actual and projected revenue, cost of goods sold, operating expenses, Gross Profit Margin and Net Profit Margin for the sale of Ecoform (or other products incorporating CAB)" for 15 identified or any other program; "C&D's total price per shipset for Ecoform and C&D's total cost per shipset for CAB," for the same identified or other programs. Probing C&D's general financial position, Azdel asked for C&D's audited and unaudited financial statements for 2010-2012, including balance sheets, profit and loss statements and notes; C&D's monthly financial statements for fiscal year 2013; and C&D's federal tax returns for 2010-2012.

Thus, the phasing of discovery had no bearing upon the Court's summary judgment ruling which pertained only to Azdel's inability to prove liability.

Azdel also served extensive discovery requests on Crane, which was not a party to the litigation below. Crane responded to this discovery by producing more than 65,500 pages of documents, many of which it had determined were not even responsive to Azdel's requests. JA 347. At the same time, Crane withheld or redacted only 462 documents based on applicable privileges. JA 204-231, 232. Of these 462, only 30 were subject to the common interest privilege at issue in this appeal (the "Common Interest Documents"), including 26 that were withheld and 4 produced in redacted form. JA 204-231, 347, 1254. Nevertheless, Azdel moved to compel the production of these privileged documents. JA 196-203. The District Judge denied Azdel's objection to Magistrate Judge Ballou's order on the issue, holding that "the record is sufficient to establish that the disputed documents were communicated in furtherance of a common legal interest between Crane and SABIC." JA 1255, 1258.

Following the completion of this extensive discovery, both parties filed summary judgment motions. Based upon consideration of the material undisputed facts and applicable law, the Court granted summary judgment in C&D's favor on all counts.

SUMMARY OF THE ARGUMENT

C&D was not obligated to pay Azdel for the delivered sheets of warped 2000gsm Aero-lite because it never accepted them.  C&D kept the "pre-production" sheets, as contemplated by the MOU and the applicable PO, in order to conduct a molding trial, run tests, determine whether the material would perform as predicted and was suitable for C&D's intended use, and determine its acceptability to American Airlines.  After those steps were taken, C&D properly terminated the PO and MOU for the 2000gsm Aero-lite both by giving Azdel written notice pursuant to Section 11.C.(i) that the product did not perform as predicted and "definitely can not be used for sidewall production" and, when asked for a formal disposition, by revising the PO to reduce to "0.00" the units wanted for each installment.  Alternatively, the MOU and PO effectively terminated when American advised C&D, after the fit check involving a sidewall made from the 2000gsm revealed numerous problems with the product (warpage, weight, cracking, and other installation issues), that the product could not be used absent an action plan that remedied those problems. Further, American declined to sign a Change Request that would have allowed C&D to use existing Aero-lite on its aircraft until a lighter weight flat Aero-lite sheet could be developed and certified for use.  This left C&D with no option but to return to delivering to American the conventional crushcore sidewalls, providing the contractual basis for termination

23

under Section 11.C.(ii) of the MOU.  Having terminated the MOU under Section

11.C, C&D was not obligated to pay any of Azdel's costs under Section 11.D, just

because Azdel prematurely manufactured nearly all of the 2,900 sheets of 2000gsm

Aero-lite even before it delivered the 40 pre-production sheets to C&D.

C&D was not obligated to pay for the 8 delivered sheets out of a lot of 20

ordered sheets of 1320gsm Aero-lite, when Azdel refused to produce the remainder

of the order when asked.  Under Virginia law, a party that renders less than

substantial performance has no right to the contract price.

Azdel has not proven that C&D provided any documents or items marked

confidential by Azdel to Crane.  The Specification provided to Crane was C&D's

proprietary document that was not marked confidential by Azdel.  The prototype

Aero-lite sidewall provided to Crane was made from a sheet of commercially-

available 1350gsm Aero-lite purchased by C&D, and was not marked confidential.

Even if it had been made from a 1320gsm sheet, that product was identified by

Azdel as "commercial" in its internal order form.  Finally, the pricing chart

provided to Crane did not contain Azdel's confidential pricing.  Rather, some of

the prices and volume discount levels were the same as those offered by Azdel and

some were different, creating a guide to the prices that C&D was willing to pay for

CAB.

Even if any confidential information was provided to Crane, Azdel cannot prevail on its wrongful disclosure claims because it did not allege and cannot show any resulting lost profits or other harm resulting from the disclosures. Azdel's failure to sell its Aero-lite product was not due to C&D's actions, but to Azdel's total inability to manufacture a viable product at either the 2000 or the 1320 gsm weights. Causation is an essential element of a breach of contract under California law.

With respect to the common interest privilege, the District Court did not abuse its discretion when it held that the Common Interest Documents were communicated in furtherance of a common legal interest between Crane and SABIC, and that Crane need not provide details of a joint legal strategy with SABIC in order to establish that the common interest privilege applies.

<div align="center">ARGUMENT</div>

I.    STANDARD OF REVIEW

The appellate court reviews a grant of summary judgment *de novo*, affirming that decision if it finds "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court should not weigh evidence to determine whether there is a "genuine" dispute. Equally important, if the evidence used to create a dispute "is merely colorable or is not significantly probative, summary judgment may be granted."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Abstract or conjectural doubts, minor discrepancies, and matters on the periphery of the material facts, likewise do not prevent summary judgment. *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008).

In its brief Azdel errs in applying this summary judgment standard to all challenged rulings. The Court's rulings on C&D's Motion to Bifurcate and on Crane's assertion of a common interest privilege involve discovery disputes. Appellate courts afford substantial discretion to district courts in managing discovery and, accordingly, the standard of review is whether there was a clear abuse of discretion. *Sagar v Oracle Corp.*, 523 Fed. Appx. 999, 1000 (4th Cir. 2013); *Rowland v. American General Finance*, 340 F.3d 187, 195 (4th Cir. 2003); *United States ex rel. Becker v. Westinghouse Savannah River Co.*, 305 F.3d 284, 290 (4th Cir. 2002).

## II.  C&D IS NOT OBLIGATED TO PAY FOR THE DELIVERED 2000GSM AERO-LITE SHEETS

### A.  C&D did not accept the Aero-lite sheets

Azdel initially argues in connection with the 2000gsm sheets delivered to C&D that it is entitled to recover the invoiced price because C&D accepted the goods. Ap. Brief, pp. 46-47. This argument is based upon the fact that C&D kept the warped sheets, passed them on to C&D's molding facility, and showed them to

American Airlines at a required fit check.[8]  According to Azdel, under Virginia

U.C.C. § 8.2-606(1)(c), such acts are inconsistent with the seller's ownership and

therefore constitute acceptance of the product.  This argument is identical to the

argument that was soundly rejected by the District Court.  JA 2156-2159.

Azdel finds acceptance only by failing to place C&D's actions in their

proper context.  It is undisputed that the delivered warped sheets were "pre-

production" samples that were not immediately rejected because C&D's Quality

Department correctly understood them to be outside of production requirements.

JA 2023-2024.  Moreover, very soon after delivery, C&D advised Azdel of the

warpage problem, which prompted Azdel's Mr. Willis to fly from Massachusetts to

the C&D molding facility in California to see the warped condition of the delivered

sheets in person.  JA 643, 682-685.  Also, although it did not happen, C&D

thought the warpage might be eliminated during sidewall molding when heat and

pressure were applied to the raw sheets.  JA 1706.  Finally, Azdel has not pointed

---

[8] Azdel emphasizes that C&D tested and certified the Aero-lite product with the FAA.  Ap. Brief, pp.10, 48.  In fact, the Sept. 5, 2008 Static Test Results report cited by Azdel, that starts at JA 2581, tests the 1500gsm Aero-lite, not the 2000gsm product that arrived warped.  More importantly, FAA certification only establishes that a product meets FAA safety requirements, i.e., that it is "structurally adequate for installation" on the specified aircraft.  FAA certification is not confirmation either that the product is generally suitable for C&D's intended use or that it meets American's other requirements, including ease of installation and maintenance, durability, and the like.  Thus, while FAA certification is a prerequisite to acceptance, it does not indicate that the involved product was accepted pursuant to the terms of the MOU.

to any document issued by C&D confirming its acceptance of the delivered sheets. Combined, these facts undercut any fact-based argument that C&D accepted the delivered sheets.

Azdel also takes a truncated view of the law, citing isolated excerpts of the U.C.C. to prove acceptance. Official Comment 4 to U.C.C. § 8.2-606 states that paragraph (c), which Azdel relies upon, is subject to other sections dealing with rejection "which permit the buyer to take certain actions with respect to the goods pursuant to his options and duties imposed by those sections, without effecting an acceptance of the goods." Further, the Virginia Comment states that "Subsection 8.2-606(1)(a) is in accord with *Rosenbaum Hardware Co. v. Paxton Lumber Co.*, 124 Va. 346, 353-55, 97 S.E. 784 (1919), in holding that a buyer does not accept goods until he has had a reasonable opportunity to inspect the goods." Section 8.2-513(1), in turn, provides that inspection may be made "at any reasonable place and time and in any reasonable manner," and Section 8.2-513(4) allows for "[a] place or method of inspection fixed by the parties."

Under the circumstances, where C&D was not allowed to fully test the properties of the Aero-lite sheets (*see* fn.2, *supra*), C&D's retention of the sheets, followed by molding trials and the American Airlines' fit check to see how the molded sheets would perform upon installation, were all part of a reasonable inspection contemplated by the parties before formal acceptance of the goods. *Cf.*

*Twin Lakes Mfg., Co. v. Coffey*, 222 Va. 467 (1982). Thus, the termination of the PO after these steps were taken, because the 2000gsm sheets "definitely can not be used for sidewall production", constituted timely and effective rejection of the defective goods.

### B. The pre-production requirement did not add to or change the terms of the MOU

Azdel argues that C&D has added to or changed the terms of the MOU by adding a "pre-production" requirement through the PO for the 2000gsm Aero-lite. Ap. Brief, pp.10, 48. Azdel focuses on the MOU's integration clause which states that the "terms, conditions, and provisions of the MOU constitute the entire agreement between the Parties and shall supersede all previous communications, representations, or agreements," as its support for this entirely new argument. JA 2191 ¶14.A.

As a general rule, an appellate court will not consider a new argument, especially where, as here, it was not even raised below in rudimentary form, which deprived the District Court of any opportunity to consider it. *In re Under Seal*, 749 F.3d 276, 285, 286 (4th Cir. 2014); *United States v. Am. Target Adver., Inc.*, 257 F.3d 348, 351 (4th Cir. 2001); *Muth v. United States*, 1 F.3d 246, 250 (4th Cir. 1993). Exceptions are made only "'in the narrowest of circumstances, where, for example, plain error or a fundamental miscarriage of justice would otherwise result." *Id*. There are no exceptional circumstances to justify its consideration here.

29

Azdel did not object to or even question the pre-production description in the

forecast or the PO at any time.

Even if not barred, the argument must be rejected because it is meritless.

C&D did not use the PO to add to or change the terms set out in the MOU.  To the

contrary, as specifically provided by Section 7.A of the MOU, a purchase order is

to contain "a description of the Products ordered, a reference to the applicable

specifications, drawings or supplier part number, the quantities and prices, the

delivery schedule, the terms and place of delivery and any special conditions as

applicable."  JA 2188, 2350-2352.  The identification of the first 40 sheet delivery

as pre-production was just such a "special condition" applicable to this particular

order.

> C.   The Court's ruling that C&D did not accept the 2000gsm Aero-
>      lite was based upon undisputed facts

Azdel next argues that C&D's acceptance or rejection of the 2000gsm Aero-

lite should be considered by a jury because it disputes whether C&D seasonably

notified Azdel of the rejection.[9]  Ap. Brief, pp.49-50. In fact, the material facts are

not in genuine dispute.  Specifically, it is undisputed that: (1) on July 2, 2008, Jim

DelPinto, C&D's Director of Materials and Process Engineering, sent Azdel's Mr.

Willis a letter stating unequivocally that the 2000gsm Aero-lite sheets produced by

---

[9] Importantly, in contrast to Section 11.C.(i) which requires 60 days notice of
termination when the product fails to perform as predicted, Section 11.C.(ii) does
not contain any notice requirement.  JA 2190.

Azdel "definitely can not be used for sidewall production;" and (2) the 2000gsm

Aero-lite sheets were intended by C&D and Azdel to be used to mold interior

aircraft sidewalls for the American Airlines' B757 refurbishment. Thus, the Court

was acting well within its proper scope when it determined that the July 2 letter, as

a legal matter, constituted adequate notice of rejection of the 2000gsm Aero-lite.[10]

The Court more than adequately explained at footnote 8 of the Opinion why

Mr. DelPinto's offer, in the same letter, to help Azdel find alternate uses for the

sheets and to keep assisting Azdel in its efforts to make a lighter Aero-lite sheet, do

not affect the validity of the notification of rejection of this 2000gsm product for

the intended purpose stated in the MOU, namely the American Airlines' B757

aircraft refurbishment. JA 2165. Azdel's "facts" were aptly described by the

District Court as those that lie on the periphery of the case and do not create a

genuine dispute as to the material facts. JA 2155. Further, the issue here is

whether the letter constituted notice, not whether the notice was timely, which is

the factual issue raised in the *Flowers Baking* case cited by Azdel as supporting

jury consideration of this issue.

Azdel also argues that the jury is entitled to consider whether C&D had

sufficient grounds to reject the goods, which Azdel contends could only occur if

---

[10] Even if the July 2, 2008 letter was insufficient, the September 17, 2008 PO
zeroing out all scheduled deliveries of Aero-lite, which Azdel's brief totally
ignores, unequivocally did so. JA 2353-2354.

the Specification was not met by the Aero-lite sheets. This argument depends upon whether compliance with the Specification is the only possible basis for rejection and/or termination of the MOU and any PO, as Azdel contends. Ap. Brief, p.51. This is a question of contract interpretation, a legal issue which the Court correctly decided against Azdel. While Azdel certainly obligated itself to meet the Specification, "that requirement is a floor for production, not a ceiling on performance" that prevents C&D from terminating a PO for the reasons set forth in the MOU's Termination provisions. JA 2159. As discussed below (pp.35-36), cancellation without liability for a breach of contract under Section 11.A of the MOU, which is what failure to meet the Specification would be, is independent of a termination for the specified reasons included in Section 11.C, either the failure to perform as predicted and lack of suitability for C&D's intended purpose, or American's request that C&D switch back to conventional materials. Thus, the District Court did not have to reach the issue of compliance with the Specification that was strongly disputed by the parties.

Azdel also contends the jury had the right to determine whether the complaints about Aero-lite were a pretext for a weight error. Ap. Brief, pp. 53-54. This argument assumes C&D alone selected the weight of the ordered sheets. However, it is undisputed that Azdel signed the MOU thereby agreeing to use 2000gsm Aero-lite for the American Airlines' project after a joint decision was

32

made to use that product due to concerns about the lack of stiffness in lighter

weight products.  JA 657, 661, 669-670, 1222, 2185 ¶ 4.1.A & 4.2, 2268-2269.

The fact that the weight proved problematic in retrospect, when combined with

Aero-lite's other problems, was not an error that would prevent C&D from

terminating the PO under either prong of Section 11.C and, accordingly, the

District Court's ruling did not wrongly interfere with Azdel's right to present

disputed material issues to a jury.

III.   **C&D WAS PERMITTED BY THE MOU TO TERMINATE THE
       PURCHASE ORDER FOR 2000GSM AERO-LITE**

   A.   The 2000gsm Aero-lite failed to perform as predicted and was
        unsuitable for C&D's intended use as sidewalls

   In support of summary judgment in its favor on Count I, C&D argued and

the District Court found that it properly terminated the 2000gsm PO under Section

11.C(i) of the MOU because the product did "not perform as predicted and is

deemed not suitable for C&D's intended use, conversion, or processing; and C&D

has given the required 60 days notice."  JA 2159-2161. As discussed above (pp.6,

10-11), in addition to weight issues, the Aero-lite did not properly form into

sidewalls as expected based upon earlier trials, nor was maintenance easier as

predicted, because molded sidewalls were brittle and cracked/tore easily when

removed from and installed in the aircraft, as required for routine airline

maintenance. *See also* JA 552 (unsuitable if not able to work on aircraft).  If that

was not sufficient to demonstrate a failure to perform as predicted and unsuitability for use as sidewalls, as also discussed above (pp.8-11), the 2000gsm sheets were without any dispute warped, they produced warped sidewalls, and even Azdel could not find any way to modify the part-forming process to eliminate the warpage present in the Azdel material at each stage of the manufacturing process.

Azdel contends that the sheets performed as predicted because the product met the Specification, which it claims is the "only standard" applicable to the 2000gsm Aero-lite. Ap. Brief, pp.51-53. While the MOU clearly states that Azdel warranted that its product would comply with the Specification (¶10.B), there is no plausible reason why the words used in Section 11.C.(i) -- "perform as predicted" and " not suitable for C&D's intended use" -- should be equated with conformity to the Specification. JA 2189-2190. Indeed, there is no reading of this plain language that would lead to such a conclusion. Had the parties intended to limit C&D's right to terminate under Section 11.C.(i) in this manner, they could have said that C&D shall have the right to terminate this MOU as well as any open orders for Azdel's failure to comply with the Specification. The fact that the parties chose very different words to express their intent shows they had something else in mind.

Because the variance in the language used is so obvious, Azdel now argues for the first time that reading "perform as predicted" and "not suitable for C&D's intended use. . ." to mean anything other than compliance with the Specification is

34

contrary to the MOU's integration clause. Ap. Brief, pp.51-52; JA 2191 ¶14.A.  As noted above (p.29), new arguments may not be considered on appeal.  Moreover, the Court did not add to or vary the provision, which is the conduct prohibited by the integration clause; it simply gave the language of the Termination clause its plain meaning.  As the MOU itself requires, it construed and interpreted the MOU in accordance with the English language.  JA 2191.  Having found that "perform as predicted" is clearly not the same as comply with the Specification referenced in other provisions of the MOU, the Court then applied the facts to the contractual terms.  It is Azdel that is attempting to vary the terms of the MOU when it demands that the Court limit the Termination clause to compliance with the Specification.

The fact that termination for failure perform as predicted is not limited to failure to comply with the Specification is evidenced by the use of the word "termination" rather than "cancellation" in Section 11.C.  These are both terms of art defined by the Virginia U.C.C. § 8.2-106(3)&(4).

> (3) "Termination" occurs when either party pursuant to a power created by agreement or law puts an end to the contract otherwise than for its breach. On "termination" all obligations which are still executory on both sides are discharged but any right based on prior breach or performance survives.

> (4) "Cancellation" occurs when either party puts an end to the contract for breach by the other and its effect is the same as that of "termination" except that the cancelling party also retains any remedy for breach of the whole contract or any unperformed balance.

Azdel's failure to comply with the Specification, as required by Sections 9 and 10.B of the MOU, is a material breach or nonobservance of the terms of the MOU that would give C&D the right under Section 11.A of the MOU "to cancel this MOU without liability. . ." The use of "termination" to describe the action to be taken under Section 11.C.(i) means that something other than an actionable breach was intended. Indeed, it allows C&D, consistent with the U.C.C., to terminate where the Aero-lite "does not perform as predicted," a failure that might not otherwise constitute a material breach of the MOU. Further, upon C&D's termination of the PO and MOU, based upon the failure of the goods to perform as predicted, C&D's executory obligation to pay for the goods and Azdel's executory obligation to deliver the previously-ordered 2000gsm Aero-lite were discharged.[11]

Azdel further contends that there are factual disputes as to whether Azdel's product performed as predicted and was suitable for its intended use. Ap. Brief, pp.53-55. However, Azdel blatantly misstates facts to build its case. For example, Azdel states that "Zodiac was new to forming panels, and it initially did not form

---

[11] Azdel has suggested that its right to compensation under Section 11.D of the MOU would survive termination, based upon the binding forecast and PO. Ap. Brief, pp.13, 54, 56. As found by the Court below, that provision can only be read to provide compensation when C&D terminates without cause and for reasons entirely within C&D's control. JA 538-540, JA 2165 fn.8. It does not logically impose financial penalties on C&D's unfettered right to terminate under Section 11.C. Such an interpretation shifts all the financial risk in the transaction to C&D, which certainly does not make sense where, as here, Azdel manufactured nearly 90 percent of an order scheduled for delivery over an 8-month period even before the 40 clearly denoted "pre-production" sheets were delivered to C&D.

Azdel's sheets properly. It's techniques, rather than Azdel's panels, were flawed." Ap. Brief., p.54. There is no evidence that C&D did not form the panels using the settings and techniques that SABIC and Azdel employees showed C&D after the forming machine was set up, and SABIC/Azdel personnel themselves, after the fact, could not modify the settings and molding techniques to produce panels without warpage. JA 518-531, 1114-1119. Azdel also states brittleness was "a result of Zodiac's manufacturing process." Ap. Brief, p.55. In fact, as Azdel's Mr. Willis testified, the product was inherently brittle. JA 689-690, 2261. The fact that C&D knew about the inherent brittleness does not create a genuine dispute about the product's performance. If anything, it supports the mutual decision of the parties to use the 2000gsm product, instead of a lighter weight sheet, for the American Airlines' project. Beyond this, Azdel's argument depends entirely upon Azdel's claim that the product met the Specification.[12] To the extent this is a disputed factual issue, it is not material because compliance with the Specification does not preclude termination under Sections 11.C.(i) or 11.C.(ii) of the MOU, both of which were found to take place.

_____

[12] Although Azdel claims unequivocally (Ap. Brief, p.50) that "Below, Azdel showed that its 2000GSM Aero-Lite met Specification", which its expert testified was the only standard the product had to meet, the facts show only that Azdel argued that the 2000gsm sheets met the Specification. Testimony from C&D's expert concluded that the product did not meet the Specification. JA 903-925. That was supplemented by testimony from Mr. DelPinto, C&D's in-house expert who drafted the Specification, similarly concluding that the Specification was not met. JA 941-945.

B.    <u>American Airlines requested a return to conventional crushcore material</u>

C&D also proved that it properly terminated the PO under Section 11.C.(ii) of the MOU, because American Airlines requested that C&D switch back to the convention crushcore material after the June 2008 fit check. JA 2161-2163. The record showed that American identified numerous problems with the sample sidewall panel installed at the fitcheck, that it gave C&D a punch list of items that had to be corrected if the product was to be used, and that it requested an action plan. JA 614, 718-730, 742, 748.

With an action list that required warpage, weight, and other installation problems to be eliminated (JA 742-748), it was obvious that the 2000gsm product delivered pursuant to PO issued under the MOU could not be used for American Airlines' sidewalls. As the Court below found, since another lighter weight, stiffer, flat product was not available, this left C&D with no other option but to return to delivering conventional crushcore made sidewalls to American.[13] JA 2162-2163. This was something C&D could do because it had, in advance, expressly promised American that it would at all times have conventional crushcore panels available for use. JA 740. The fact that Azdel, with C&D's encouragement, worked on development of a lighter (and presumably flatter)

---

[13] Moreover, the MOU does not place any limitations on the bases for American's rejection of the 2000gsm product; any reason justified termination.

Aero-lite product over the next few months, and suggested unsuccessfully that American use existing Aero-lite sidewalls as a temporary measure, does not create any genuinely-disputed issue because American never agreed to purchase Aero-lite sidewalls by executing the contract Change Request. JA 750-755.

Azdel contends that the MOU and PO "continued as Azdel and Zodiac worked on the lighter weight 1320GSM Aero-Lite that followed 2000GSM Aero-lite." Ap. Brief, p.56. Importantly, however, the MOU and the involved PO for 2,900 Aero-lite sheets both specifically provided for 2000gsm Aero-lite to support the refurbishment program of the American Airlines 757 aircraft. JA 2185-2186 ¶¶ 4.1.A, 4.2. Therefore, as the Court correctly found, rejection of this particular weight Aero-Lite is all that is required for termination under Section 11.C. That alone is the program that was terminated and required the return to the conventional crushcore materials.

Finally, Azdel argues that C&D could not terminate the PO without also terminating the MOU. Ap. Brief, p.56. Section 11.C does not expressly require C&D to terminate both. Rather, it gives C&D the option to terminate the MOU "as well as" open purchase orders. Moreover, although the time of termination is not definite – upon self-termination 60 days after the MOU's execution, C&D's July 2, 2008 written notice, or American's rejection of the product after the fit check and

39

its failure to sign the Change Request approving the use of Aero-lite – it is evident

that the MOU as well as the PO was terminated.

IV.    C&D WAS NOT OBLIGATED TO PAY FOR THE INCOMPLETE
       SHIPMENT OF 1320GSM AERO-LITE

       In Count III of the Complaint, Azdel sought to recover $6,000 for 8

out of 20 ordered sheets of 1320gsm Aero-lite.  Azdel argues that it is

entitled to payment for this less than perfect tender under the Virginia

U.C.C. §8.2-601 because the 20 sheets did not, as a legal matter, constitute a

commercial unit and, further, because the 8 delivered sheets were not

rejected by C&D.  Ap. Brief, pp.58-59.  As with the 2000gsm sheets, Azdel

argues that acceptance occurred because C&D kept and molded some of the

delivered sheets knowing it was a partial performance.

       Here again, Azdel ignores several material facts.  First, unlike the purchase

order for the 2000gsm and other lighter weight Aero-lite sheets, which were based

upon per sheet pricing, the PO for the 1320gsm Aero-lite sheets contained a single

$15,000 price for the entire lot.  *Compare* JA 2349-2352, 2370 *with* JA 2369.  This

is reflected in the "Description" block of the PO which expressly states that the

"LOT CHARGE IS FOR 20 SAMPLE SHEETS" and in the unit (U/M) block

which contains an LT (lot) designation instead of an SH (sheet) designation.  JA

2369.  Further, Azdel's original price proposal indicated that 20 sheets was a

minimum, and that the per lot price would stay the same even if Azdel produced

40

and delivered more than 20 sheets. JA 2361, 2543. Indeed, C&D needed at least 20 sheets to determine the proper settings on the forming machine, conduct a trial run, and have enough for qualification and certification if the product was accepted by American. JA 639-630, 701.[14] Thus while C&D's plant manager molded several sheets and sent them for preliminary testing, he also asked Azdel whether it would produce additional sheets to complete the order, but the answer was "no". JA 696, 709-710. Looking at these undisputed facts, it is clear that the 20 sheets that Azdel had agreed to sell and C&D agreed to buy were indeed a single "commercial unit" as defined by the Virginia U.C.C. § 8.2-105.

Virginia follows the majority rule that a party that renders less than "substantial performance" has no right to the contract price. *J. David Conti, Inc. v. Stokes Equip. Co., Inc.*, 1995 U.S. App. LEXIS 36350, at *13 (4th Cir. 1995); *American Chlorophyll, Inc. v. Schertz*, 176 Va. 362, 372, 11 S.E.2d 625, 629 (S. Ct. Va. 1940); *see* Va. U.C.C. § 8.2-601 (buyer has option to reject whole where goods fail to conform to contract). Accordingly, where a contract is entire, a material breach will preclude recovery even for the partial performance prior to the

[14] In C&D's summary judgment brief, Dkt. No.145 at p.29, C&D cited to page 28 of the Danny Martin deposition to show the inadequacy of the 8 sheets of 1320gsm Aero-lite to fully test the product. When Mr. Martin was asked if he had to scrape off the scrim to bond material to that product, he testified "I did not, that I can recall. The problem with that -lite is, I didn't get enough material to really, really truly test it." This page apparently was inadvertently left out of the exhibits filed in the docket and, accordingly, is not in the Appendix provided to this Court.

breach. *See id*. Thus, Azdel is not entitled to recover for its partial performance after refusing to completely perform when given the opportunity to cure the default, and summary judgment in C&D's favor on Count III of the Complaint was appropriate.

## V.   AZDEL DID NOT ESTABLISH DISCLOSURES OF ANY CONFIDENTIAL INFORMATION BY C&D

Azdel first contends in support of Counts IV and V of the Complaint, its wrongful disclosure claims, that Azdel's confidential information was provided by C&D to Crane and used by Crane to quickly develop an Aero-lite "knockoff" that C&D used in the refurbishment of some of American Airlines B757 aircraft. Next, assuming such a breach of confidentiality, Azdel claims it is entitled to relief even if it is unable to demonstrate any economic loss.

Adzel opens and closes its argument justifying relief for the alleged confidentiality breaches with maxims that have been applied in cases involving non-disclosure agreements, namely that "one who takes the benefit must bear the burden" and "[f]or every wrong there is a remedy." Ap. Brief, pp.32, 46. But these are simply two out of 39 general maxims of jurisprudence set forth in the California Civil Code to aid in the "just application" of substantive provisions of the Code. *See* Cal. Civ. Code § 3509-3548; *Daniels v. McPhail*, 93 Cal. App. 2d 479; 209 P.2d 19 (Ct. App. 1949). They do not, by themselves, establish any independent right to a remedy in any particular case, nor are they substantive law.

42

A.    The Specification is C&D's confidential document

Of the three alleged wrongful disclosures – the Specification, a prototype sidewall made from 1320gsm Aero-lite, and Azdel's pricing information – the Specification is the only one mentioned in the Complaint.  While the precise version of the Specification attached to the MOU (which applies to 1500, 1750, and 2000gsm Aero-lite) was not provided to Crane, C&D admits that a slightly revised version of this Specification, Revision A, which was modified primarily to include the 1320gsm product (hereafter "1320 Specification"), was provided to Crane.  JA 2416-2425.  Like the Specification attached to the MOU, this 1320 Specification was marked proprietary by C&D.  JA 2198-2208, 2417-2425.  Even Azdel's witnesses conceded that the Specification, which was labeled proprietary but not confidential, was C&D's document.  JA 2028-2029.  Moreover, it was not protected by the NDA since Azdel did not and, having no ownership interest in the document, could not mark it confidential.

Recognizing this inescapable fact, Azdel illogically contends it is entitled to challenge disclosure of the 1320 Specification under the Confidentiality provision of the MOU.  Ap. Brief, p.39.  First, because this particular Specification was not attached to the MOU the Court can certainly question why Azdel could even raise this point.  Second, even if it was the attached Specification, the MOU only

makes "This MOU and any subsequent PO's" confidential. JA 2191. As found by the Court below, "To state the obvious, it does not mention the Specification." JA 2169.

The Specification does not become part of the MOU simply because it was attached. Such a reading is at odds with the long-established rule of construction, *expressio unius est exclusio alterius*, that the express mention of specific items in a contract provision excludes all others. *Smith Barney Inc. v. Critical Health Syst. of N.C.*, 212 F.3d 858, 861 (4th Cir. 2000); *Charlotte Union Bus Station, Inc. v. Internal Revenue*, 209 F.2d 586, 589-590 (4th Cir. 1954); *Bentley Funding Group v. SK&R Group, LLC*, 269 Va. 315, 324, 329, 609 S.E.2d 49 (2005); *Cf. Murphy v. DirecTV, Inc.*, 724 F.3d 1218, 1234 (9th Cir. 2013); *Black v. Richfield Oil Corp.*, 41 F. Supp. 988, 995 (S.D. Cal. 1941). It is also inconsistent with the document as a whole. The term MOU is sometimes used in a context where it's clear that it does not include the Specification (¶ 5.1.A). Further, the Specification is expressly referenced elsewhere in the MOU (¶¶ 9 & 10) and, when both the MOU and the Specification are relevant to the subject matter, they are both referenced (¶ 7.A). The parties could have done the same here, if that was their intent.

Azdel also cites case law, rejected below as inapposite, stating that two papers executed at the same time must be regarded as parts of one transaction and be construed as if their provisions were in the same agreement. Ap. Brief, p.40.

However, the attached Specification, which was dated nearly one year earlier than the MOU, was prepared only for internal C&D signatures and was unexecuted when it was attached to the MOU.   JA 2198.  The 1320 Specification given to Crane was similarly prepared for C&D's signatures only and was dated July 30, 2009, nearly 15 months after the MOU was executed.  JA 2417.

Finally, Azdel contends that C&D has admitted in its responses to Azdel's Requests for Admission that the MOU is "comprised of the agreement and its attachments, including the Specification", citing to Request No. 1.  Ap. Brief, p.40.  Omitted from Azdel's analysis is C&D's denial in response to Request No. 3, when asked to "Admit that the Specifications were drafted by C&D Zodiac for inclusion in the MOU."[15]  Further, in admitting "that Exhibit A attached hereto is a true and genuine copy of the Memorandum of Understanding ("MOU") between C&D Zodiac and Azdel," C&D understood itself to be authenticating the document, a common purpose for such requests, not making a legal admission regarding its understanding of the term "This MOU" as used in Paragraph 12 of the MOU.

  B. <u>C&D did not provide Crane with a confidential prototype Aero-lite sidewall</u>

Azdel also contends that C&D disclosed its "prototype, lightweight Aero-Lite to Crane."   Ap. Brief, pp.36-39.  This is based upon the fact that, in March

---

[15] Azdel included only the first page of Defendant's Responses to its Requests for Admission as its Exhibit below and on appeal.  This use of an isolated excerpt ignored C&D's more telling response to Request No. 3 on the very next page.

2010 molding trials on Crane's already-developed CAB product, C&D allowed Crane to mold an Aero-lite sheet as a control and gave Crane this molded sheet. Azdel has not provided any evidence that it marked any Aero-lite sheets delivered to C&D as Confidential, or even that any shipping papers accompanying the delivery mentioned confidentiality.[16]  Accordingly, there is no basis for any claim of confidentiality under the NDA, which requires that information be "conspicuously labeled by the disclosing Party as 'Confidential'" in order to acquire that status.  JA 2192; *see also* 608-609.

Azdel's evidentiary support that the sidewall provided to Crane was made from its 1320gsm Aero-lite material consists entirely of a Report of the molding trials, dated March 28, 2010, which further belies this contention.  JA 1023-1036. The Report actually refers only to 1350gsm Aero-lite.  JA 1023-1036, at 1026. Indeed, Azdel itself (Ap. Brief, p.36) refers to the disclosed product in its brief as "1350GMS Weight Aero-Lite", not 1320gsm.  As discussed above (pp.17-18), this is a separate product ordered by C&D on October 1, 2008, more than six months before the 1320gsm product was ordered, that C&D paid $30,000 for pursuant to revised PO 2-1029-3.  JA 1026, 2370-2371.

---

[16] Further, Azdel's current claims regarding confidentiality of molded Aero-lite samples are inconsistent with its historic free exhibition and distribution of Aero-lite samples to anyone who might be interested in purchasing the product.  JA 1103.

Second, Crane's witness on this subject stated unequivocally that the Azdel sheet was identified as a commercial product. JA 1902-1903. Although Azdel, for the first time in this litigation (Ap. Brief., pp.38-39), now suggests that the testimony is suspect because of its timing and notes that the 1320 has on some occasions been referred to as 1350gsm, there is absolutely no testimony or documentary evidence in the record showing that a sheet of 1320gsm was used in these trials and provided to Crane. Finally, even if the 1320gsm had been used, Azdel's claim to confidentiality is also contrary to an internal Azdel order form produced by Azdel in discovery that referred to the 1320 product as commercial. JA 2543.

Azdel's abstract or conjectural doubts about the weight of the sidewall used as a control in the molding trials are not sufficient to create a genuine dispute about the actual weight. Thus, Azdel's contention that the Court resolved a factual issue in the face of conflicting evidence is unsupported and not significantly probative to preclude summary judgment. The fact that Azdel's pricing letters said it was providing "samples" to C&D and that the 1320gsm product "has not been validated in this application" means only what it says, that these are samples to be tested and validated so C&D can decide whether to place a larger order for the product. These terms are not in any way indicative of the commercial or non-commercial nature of the product, nor do they in any way suggest that it is confidential as Azdel contends. Ap. Brief, p.38.

47

C.    <u>C&D did not disclose Azdel's confidential pricing information</u>

Finally, Azdel claims that C&D wrongfully disclosed its confidential pricing information to Crane.  Ap. Brief, pp. 32-36.  Azdel did not argue that C&D gave any of Azdel's confidential price quote letters to Crane, because that simply did not happen.  Further, having been caught making deliberate misrepresentations to the Court below about the content of C&D's pricing chart, Azdel now concedes that the pricing information provided to Crane was not identical to that offered by Azdel, noting instead that similar and different prices were "mixed."  JA 2171-2172.  However, as discussed more fully above (pp.18-19), Azdel still did not reveal to the Court the true extent of the differences, which are significant.

The use of some numbers in the chart that are the same as those offered by Azdel is not determinative, as the numbers themselves are not sacrosanct.  C&D cannot realistically be prevented from ever using the same prices in negotiations with other vendors for similar products.  Further, since Crane's CAB was to be used for the same interior aircraft sidewalls as Aero-lite, it should be expected that C&D would seek similar pricing from them. Any buyer is entitled to let sellers know the baseline prices it is willing to pay for a product, even if the price is the same as that previously offered by another vendor.  That is all C&D was doing here with Crane.  JA 548. Indeed, it would be anticompetitive to prevent a buyer from making such use of past pricing experience.

A review of the three types of allegedly disclosed confidential information reveals a situation very similar to that found by the appellate court in *SL Montevideo Tech., Inc.("SLM") v. Eaton Aerospace, LLC*, 491 F.3d 350 (8th Cir. 2007), to be insufficient to defeat summary judgment. Eaton had contracted with SLM to provide a brushless direct current motor meeting Eaton's specifications intended to fulfill a contract to supply Boeing with stabilizer trim motors for its aircraft. When SLM could not provide the product, Eaton went elsewhere. After losing on its claim for breach of a Proprietary Information Agreement, SLM appealed to the Eighth Circuit which held, in words directly applicable here (*Id*. at 353-354):

> Yet SLM asserts the right to bar Eaton from using "the entire design" of a customized product which it designed to Eaton's specifications, with guidance from Eaton and Boeing, and which Eaton purchased outright from SLM. If upheld, this claim would preclude Eaton from obtaining this critical component from another source (including Eaton itself) after SLM ended their relationship.

The Court found that such a result would place Eaton in an "extraordinary straightjacket", precisely what Azdel is trying to do here to C&D, thereby frustrating C&D's pursuit of its legitimate business interests.

## VI.  AZDEL IS NOT ENTITLED TO RELIEF ABSENT A SHOWING OF CAUSATION OF HARM

The Court below correctly granted C&D summary judgment on the breach of confidentiality claims because Azdel:

has not shown or made any attempt to show that it suffered any injury
and damage "**caused by**" or "**as result of**" Defendant's alleged breach
of its contractual confidentiality obligation, which is an essential
element of a breach of contract claim.

JA 2175 (emphasis added).  Indeed, Azdel's counsel admitted at the hearing on

C&D's Motion to Bifurcate damages from liability on the wrongful disclosure

claims "that it did not seek to recover any of its lost profits for the breach of the

confidentiality agreement."  *See* JA 185, fn.1.  This is not surprising since Azdel

did not suffer any lost sales of Aero-lite caused by C&D's actions.

First, there is no evidence C&D provided any information about the Aero-

lite formula to Crane.  Indeed, C&D could not have done so because it had no

access to such proprietary information.  JA 554, 593-594, 2201 ¶2.1.  Second, as

discussed above (pp.16-17), Crane used a very different manufacturing process

than Azdel, which may well explain its success where Azdel failed.  JA 594-

598,1215-1217, 2466-2468.  Third, Crane did not get the molded Aero-lite

sidewall until the March 2010 molding trials, many months after the CAB product

was essentially developed.  JA 578, 2474-2475.  Fourth, and most important, any

losses were the result of Azdel's own conduct, its premature production of

thousands of warped 2000gsm sheets that C&D could not sell to its customer and

its inability to produce more than 8 sheets of 1320gsm Aero-lite when asked to do

so.  Moreover, according to Azdel's CEO it has the machinery and is still capable

of manufacturing Aero-lite and several weights are still listed on its website. JA 612-613, www.azdel.com/lwrt.htm.

It is well-established that an actionable breach of contract under California law requires proof of a causal connection between the alleged breach of contract and the injury for which relief is sought. *Troyk v. Farmers Group,Inc.*, 171 Cal. App. 4th 1305, 1352, 90 Cal. Rptr.3d 589 (2009); *Gardner v. RSM&A Foreclosure Servs*, *LLC*, 2013 U.S. Dist. LEXIS 89303, *6 (E.D. Cal. 2013); *CDF Firefighters v. Maldonado*, 158 Cal. App. 4th 1226, 1239, 70 Cal. Rptr.3d 667, 679 (2008).[17] The need for causation is implicit in California's Civil Code Section 3300 which defines the measure of damages for breach of contract as "the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom."

Azdel claims it is entitled to disgorgement of C&D's profits and Azdel's development costs for breaches of the NDA even where it cannot show any lost profits. Ap. Brief, pp.41-44. Azdel errs insofar as it focuses on the lack of proof of actual damages rather than proof of causation of damages. Azdel relies primarily upon two cases -- *Ajaxo Inc. v. E*Trade Group Inc.*, 135 Ca. App. 4th 21 (2005) and *Foster Poultry Farms v. Suntrust Bank*, 377 Fed. Appx. 665 (9th Cir. 2010) –

---

[17] Causation is also required under Virginia law. *See Martin v. NAES Corp.*, 2013 U.S. Dist. LEXIS 20361 (W.D. Va. 2012); *Filak v. George*, 267 Va. 612, 594 S.E.2d 610 (Va. 2004); *Tattoo Art, Inc. v. TAT Int'l*, 794 F. Supp. 2d 634 (E.D. Va 2011); *SunTrust Bank v. Farrar*, 227 Va. 546, 675 S.E.2d 187 (S. Ct. Va. 2009).

that awarded development costs and/or profits earned by the wrongdoer as the measure of damages for unjust enrichment.  As a preliminary matter, it must be noted that this is not an unjust enrichment case.  A review of the Complaint, Counts IV and V, clearly shows that it is a breach of contract case.[18]   JA 89-100. "Breach of Contract" language, not unjust enrichment, is used in the captions and throughout the allegations in the Complaint.  JA 97-99.  Moreover, since neither *Ajaxo* nor *Poultry Farms* specifically discuss the need to prove causation, they should not be read to eliminate this well-established legal requirement developed in other California case law, to effectively hold a party liable for actions that did not cause any harm to the complainant.

In the present case, Azdel is attempting to turn its inability to successfully commercialize Aero-lite into a windfall from C&D that far exceeds the $36,265.92 invoiced for the limited amount of 2000 and 1320gsm Aero-lite sheets actually delivered to C&D.  Specifically, it is seeking nearly the full invoiced price that C&D would have paid if the 2000gsm Aero-lite material had been usable for aircraft sidewalls as well as the $6,000 invoiced for the 8 out of 20 ordered sheets of 1320gsm Aero-lite that it was able to deliver.  JA 147.  It is also seeking more

---

[18] It is well established under California law that breach of contract "requires a showing of appreciable and actual damage." *Ruiz v. Gap, Inc.*, 380 Fed. Appx. 689, 692 (9th Cir. 2010); *Aguilera v. Pirelli Armstrong Tire Corp.*, 223 F.3d 1010, 1015 (9th Cir. 2000*); Patent Scaffolding Co. v. William Simpson Constr. Co.*, 256 Cal. App. 2d 506, 64 Cal. Rptr. 187, 191 (1967).

than $1 million in costs it has allocated to Aero-lite's development, and an

undetermined amount of profits that C&D has made from the sale of any product

that incorporates Crane's CAB sheets.  Dkt. No. 75 pp. 9,11; JA 99, 148.  Finally,

in addition to this monetary relief, Azdel is seeking to enjoin C&D from selling

any CAB-based products in the future.  JA 99-100.

The combined recovery sought far exceeds the relief allowed in either of the

cases relied upon by Azdel and would effectively constitute double or more

recovery – and for injuries not even caused by C&D.  *See Ajaxo*, *supra*, at 56;

*Sperry Rand Corp. v. A-T-O, Inc.*, 447 F.2d 1387, 1393 (4th Cir. 1971).  In *Ajaxo*,

the plaintiff recovered from E*Trade its development costs as well as the amount

that E*Trade had agreed to pay Ajaxo for its technology.  There was no award of

the profits that E*Trade had made as a result of the transfer of Ajaxo's technology

to a third party.  In the *Foster Poultry* case, the plaintiff was allowed to recover the

profits, in the form of interest and fees, that were made by Suntrust as a result of its

misappropriation of Foster's confidential information.  There were no development

costs or other categories of damages awarded for the same transactions.  Nor

would it "be equitable, logical, or legally permissible to award plaintiffs the full

replacement value of property that they never lost or gave away."  *Oracle Corp. v.

SAP AG*, 734 F. Supp. 956, 969-970 (N.D. Cal. 2010).  Yet that is precisely the

situation here where Azdel, and Azdel alone, still has the Aero-lite formula and the machinery needed to profit from its manufacture.

In further support of its claim to recover C&D's profits, without any proof of causation, Azdel cites to the "specific performance or injunctive relief" clause of the NDA (JA 2196 ¶11), which provides, in the event of an NDA violation, that the disclosing party would "be substantially and irreparably harmed, damages are impossible to ascertain in advance, and monetary damages will not sufficiently compensate the disclosing Party." Ap. Brief, pp.16, 44.  To state the obvious, this provision provides for specific performance and injunctive relief without proof of irreparable harm.  It does not provide an independent basis for monetary damages, whether based upon Azdel's development costs or C&D's profits from CAB, nor does it eliminate the need to prove causation to collect damages.

Even with respect to injunctive relief, federal courts in California are reluctant to issue an injunction just based entirely upon a clause conceding irreparable harm.  Such clauses are given "little weight", are "insufficient" by themselves to justify injunctive relief, and are only one factor in the irreparable harm inquiry. *La Jolla Cove Investors, Inc. v. Goconnect Ltd.*, 2012 U.S. Dist. LEXIS 62948, at *11 (S.D. Cal. 2012); *Flextronics Int'l, Ltd. v. Parametric Tech., Corp.*, 2013 U.S. Dist. LEXIS 133403, at *24-25 (N.D. Cal. 2013).  An actual demonstration of likelihood of irreparable harm is required.

Azdel claims that any consideration of causation and available damages was premature because the record on damages is incomplete.  Ap. Brief, pp.45-46. This was based upon the Court's grant of C&D's Motion to Bifurcate.  As discussed above (pp.20-22), the bifurcation of discovery into "the issues of any relief to be awarded upon a finding of liability as to Counts IV and V. . ." and imposition of a Protective Order prohibiting such discovery (JA 184-190) did not impede the extensive discovery that Azdel conducted into the merits of the NDA-based claims. It was only discovery probing C&D's sensitive finances and product-related costs that was subjected to a protective order following bifurcation.

Under the circumstances, the Court was acting well within its discretion when it bifurcated Azdel's discovery into the damages from the alleged breach of the NDA until after Azdel proved liability on that claim, based upon the finding that bifurcation would promote judicial economy.  Absent an abuse of discretion, that decision must be upheld by this Court.  *Sagar v Oracle, supra*; *Rowland v. American General Finance. supra*; *United States v. Westinghouse Savannah River, supra*.

As found by the Court below, "Defendant is not seeking summary judgment on the ground that Plaintiff has not proven the amount of its lost profits.  It is seeking summary judgment on the ground that Plaintiff has not proved, or even attempted to prove, that the alleged disclosures "resulted in" or "caused" Plaintiff

any harm." JA 2176. Proof of liability for a breach of the confidentiality

provisions of the NDA and the amount and type of relief available if a breach is

found are obviously independent legal inquiries. *Id*. The Court's ruling granting

C&D summary judgment on the breach of confidentiality claims was based upon a

full record on the liability issue, a record that demonstrated the lack of merit of

Azdel's claims.

VII.    THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION WHEN IT
        CORRECTLY HELD THAT THE COMMON INTEREST DOCUMENTS
        ARE PRIVILEGED AND SHOULD NOT BE PRODUCED

        Apparently unaware of the order from which it is appealing, Azdel

incorrectly asserts that "The Magistrate Judge . . . denied Azdel's challenge to the

common interest privilege. Azdel objected to this portion of the Magistrate's

order, but the *District Court did not rule on the objections prior to dismissing

Azdel's case*." Ap. Brief, p.5 (emphasis added and internal citations omitted).[19] In

fact, the District Court very clearly denied Azdel's objections to the Magistrate's

common interest ruling. JA 1258 ("I conclude that Judge Ballou's denial of the

motion to compel the documents on the basis of the common interest privilege

---

[19] The blatant nature of this misstatement is indicative of Azdel's litigation
approach which has led to this frivolous appeal from a discovery order, which
Azdel has made without even acknowledging in its brief that an abuse of discretion
standard applies to the common interest issue. The effect of this strategy has been
to inflict substantial and ongoing litigation expenses upon a non-party. An award
of damages and single or double costs in favor of Crane would be appropriate
pursuant to Fed. R. App. P. 38.

cannot be interpreted as clearly erroneous and contrary to the law.  Accordingly,

Plaintiff's objection . . . is denied.").

Azdel now appeals from this discovery order and asks this Court to consider

its arguments on the common interest issue, which already have been rejected by a

magistrate judge and a district judge, for a third time.  However, Azdel simply

cannot overcome the abuse of discretion standard applicable to discovery rulings,

especially in light of the District Court's well-reasoned opinion.  JA 1254 -1258;

*Sagar v Oracle, supra*; *Rowland v. American General Finance. supra*; *United*

*States v. Westinghouse Savannah River, supra*.

As the District Court noted, in the proceedings below Azdel did not

"challenge the existence of a common legal *interest* between Crane and SABIC,

and it acknowledged that two parties certainly may be engaged in a joint legal

strategy even though both are not currently party to a pending litigation."  JA 1256

(internal quotations omitted).[20]  Thus, the thrust of Azdel's argument is its

assertion that Crane was required to establish a joint legal strategy with SABIC,

instead of a joint legal interest.  The District Court rejected this argument, and

instead, after correctly analyzing whether Crane and SABIC had a "common

---

[20] The District Court correctly explained that "[t]he common interest privilege applies, among other situations, to 'potential co-parties to prospective litigation,' such as Crane and SABIC."  JA 1254 (citing *In re Grand Jury Subpoenas*, 902 F.2d 244, 249 (4th Cir. 1990) and *Hunton & Williams v. U.S. Dept. of Justice*, 590 F.3d 272, 277 (4th Cir. 2010)).

interest about a legal matter" and whether the Common Interest Documents were in furtherance of this common interest, held that the common interest privilege applied. JA 1256-1258.

Far from an abuse of discretion, the District Court's common interest holding is consistent with the long-established requirements for a valid assertion of the common interest privilege in the Fourth Circuit. Specifically, Fourth Circuit precedent holds that protected communications do not lose their privileged status when shared with another party who has "a common interest about a legal matter," as long as the disclosure is in furtherance of that common interest. As explained in *In re Grand Jury Subpoenas*, 902 F.2d 244, 249 (4th Cir. 1990) (emphasis added):

> Whether an action is ongoing or contemplated, whether the jointly interested persons are defendants or plaintiffs, and whether the litigation or potential litigation is civil or criminal, the rationale for the joint defense rule is unchanged: persons who share a *common interest* in litigation should be able to communicate with their respective attorneys and with each other to more effectively prosecute or defend their claims.

Even the cases upon which Azdel relies do not require a showing of a joint legal strategy. *See United States v. Okun*, 281 Fed. Appx. 228, 232 (4th Cir. 2008) (noting that "the common interest privilege allows attorneys representing different clients with *similar legal interests* to share information without having to disclose it to others" (emphasis added and internal quotations omitted)); *In re Grand Jury Subpoenas*, 902 F.2d at 249 (quoted above).

58

In an apparent change of course on appeal, Azdel now asserts that "Crane failed to show that it pursued a common legal strategy *with Zodiac*." Ap. Brief, p. 61 (emphasis added). Of course, whether Crane and C&D Zodiac shared a common legal strategy is completely irrelevant here. The Common Interest Documents were communications between Crane and SABIC (and their counsel), which were withheld on the basis of a common legal interest between those parties. C&D has no place in this analysis. In any event, this new argument was not advanced below and can be rejected on that basis alone. *See* p.29, *supra*.

Finally, Azdel argues that "Crane's assertion that it could be a witness in an arbitration was insufficient to create a legal privilege as one does not obtain a privilege with a defendant simply by virtue of being a person with knowledge." Ap. Brief, p.61. This statement reflects a mischaracterization of Crane's asserted common interest with SABIC. As the District Court correctly held:

> The information provided by Crane satisfies the requirements for an assertion of privilege pursuant to a common interest agreement. In March 2011, SABIC received a letter from [Azdel]. The letter outlined claims that [Azdel] might bring against SABIC. As described in the letter, [Azdel's] claims implicated Crane's legal interests, and it appeared that Crane potentially could be a witness or even a party to litigation or arbitration initiated by [Azdel]. Crane and SABIC concluded that they shared a common legal interest arising from [Azdel]'s assertions, and entered into a common interest agreement, which was thereafter memorialized in writing.

JA 1255-1256; *see also* 296-97, 306-307, 509-510. Crane clearly was more than simply "a person with knowledge," and this case is easily distinguished from *In Re Grand Jury Subpoenas*, *supra*, 902 F.2d at 249 (memoranda describing employee interviews conducted in the course of an internal investigation were not protected by common interest doctrine), and *Okun*, *supra*, 281 Fed. Appx. at 232 (company CEO could not invoke common interest privilege to quash subpoena issued to in-house counsel where CEO had "likely refused to cooperate with. . .internal investigation"). As the District Court correctly observed, "The contrast between the facts in [*In Re Grand Jury Subpoenas*] and the instant case could not be sharper. The information provided by Crane indicates that its common interest with SABIC arose from [Azdel's] claims and Crane and SABIC's shared legal interest about a legal matter." JA 1257.

Quite simply, there was no abuse of discretion by the District Court when it denied Azdel's objections to the Magistrate's ruling in favor of Crane on the common interest privilege. In fact, because Azdel neglects to mention that an abuse of discretion standard applies to this discovery ruling on appeal, it does not even argue that the District Court abused its discretion. Thus, the District Court's common interest ruling should be affirmed.

## VIII.  AZDEL'S MOTION FOR PARTIAL SUMMARY JUDGMENT WAS PROPERLY DENIED

As its final Issue Presented for Review, Azdel argues that the facts should have resulted in summary judgment in its favor on all causes of action.  As discussed above, the Court's grant of summary judgment to C&D on all counts of the Complaint and denial of Azdel's cross-motion for partial summary judgment was fully justified.  Even if the Court had erred in any respect in connection with the grant of C&D's motion, it would not mandate a grant of summary judgment to Azdel.  Denials of summary judgment are reviewed for abuse of discretion.  This standard is rarely met because a court may properly decline summary judgment even where Rule 56 standards have been met, because it thinks issues should be decided by a jury.  *Forest Hills Early Learning Ctr., Inc. v. Lukhard*, 728 F.2d 230, 245 (4th Cir. 1984); *see also Anderson v. Liberty Lobby*, *supra*, 477 U.S. at 255.   This certainly is not the rare case where a denial should be reversed.

## CONCLUSION

For all the reasons discussed above, this Court should affirm the District

Court's grant of summary judgment in favor of C&D on all counts.

Respectfully submitted,

C&D ZODIAC, INC.


/s/ Robert P. Silverberg
Robert P. Silverberg
Claire L. Shapiro
SILVERBERG, GOLDMAN & BIKOFF, LLP
1101 30th Street, N.W.
Washington, D.C. 20007
(202) 944-3300
rsilverberg@sgbdc.com
cshapiro@sgbdc.com

Bevin R. Alexander, Jr. (VSB No. 21431)
J. Barrett Lucy (VSB No. 48512)
FREEMAN, DUNN, ALEXANDER, GAY,
    LUCY & COATES, PC
1045 Cottontown Road
Lynchburg, VA 24503
(434) 528-3400
balexander@freemandunn.com

NEENAH TECHNICAL MATERIALS, INC.

/s/ Mark D. Cahill
Mark D. Cahill
Jared M. Barnes
CHOATE, HALL & STEWART LLP
2 International Place
Boston, MA 02110
(617) 248-5000
mcahill@choate.com
jbarnes@choate.com

<u>CERTIFICATE OF COMPLIANCE WITH RULE 32(a)</u>
Certificate of Compliance with Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements

1.    Per this Court's Order allowing an oversized Brief of 15,400 words, this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

> this brief contains <u>15,360</u> words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

> this brief has been prepared in a proportionally spaced typeface using <u>Microsoft Word</u> in <u>14 point Times New Roman</u>.

<u>/s/ Robert P. Silverberg</u>
Robert P. Silverberg

*Counsel for Appellees*

Dated:  November 14, 2014

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on November 14, 2014, I electronically filed the

foregoing with the Clerk of Court using the CM/ECF System, which will send

notice of such filing to the following:

> Erin B. Ashwell
> Francis H. Casola
> Frank K. Friedman
> Woods Rogers, PLC
> P.O. Box 14125
> Roanoke, VA  24038
>
> *Counsel for Appellant*

The necessary filing and service were performed in accordance with the

instructions given to me by counsel in this case.

<div align="right">

/s/ Melissa A. Dockery
Melissa A. Dockery
GIBSON MOORE APPELLATE SERVICES, LLC
421 East Franklin Street, Suite 230
Richmond, VA  23219

</div>